# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

———————————————————————
|  | ) |
| ARCELORMITTAL TUBULAR PRODUCTS; MICHIGAN SEAMLESS TUBE, LLC; WEBCO INDUSTRIES, INC.; and ZEKELMAN INDUSTRIES, INC., | ) ) ) ) ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| Defendant, | ) |
|  | ) |
| and | ) |
|  | ) |
| DALMINE S.p.A., | ) |
|  | ) |
| Defendant-Intervenor. | ) |

Court No. 24-00039

———————————————————————

**Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, ArcelorMittal Tubular Products, Michigan Seamless Tube, LLC, Webco Industries, Inc., and Zekelman Industries, Inc. ("Plaintiffs"), respectfully move for judgment on the agency record in the above-referenced action.

For the reasons set forth in the Memorandum of Law of Plaintiffs in Support of its Motion for Judgment on the Agency Record, Plaintiffs request that this Court hold that the final determination by the U.S. Department of Commerce, as set forth in *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From Italy: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 1523 (Dep't Commerce Jan. 10, 2024) (Appx1012-1013), and the accompanying *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy; 2021-2022* (Jan. 3, 2024) (Appx1000-1011), and Commerce's subsequent *Remand Results* (*Final Results of Redetermination Pursuant to Court Remand* (Dec. 19, 2024) ("*Remand Results*") (Appx7759-7769)), is unsupported by substantial evidence and otherwise not in accordance with law. Plaintiffs, therefore, move that the Court remand the Department of Commerce's final determination to

the agency for disposition in a manner consistent with the

judgment of the Court.

Respectfully submitted,

/s/ Melissa M. Brewer
R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Plaintiffs

Dated: February 28, 2025

NONCONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| ARCELORMITTAL TUBULAR PRODUCTS, *et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 24-00039 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) | |
| DALMINE S.p.A., | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR JUDGMENT UPON THE AGENCY RECORD**

R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP

Counsel to Plaintiffs ArcelorMittal
Tubular Products, Michigan
Seamless Tube, LLC, Webco
Industries, Inc., and Zekelman
Industries, Inc.

February 28, 2025

NONCONFIDENTIAL

# Table of Contents

**Page**

Administrative Determination Under Review ........................................ 1

Issue Presented and Summary of Argument........................................... 2

Standard of Review ...................................................................... 4

Statement of Facts ...................................................................... 6

Argument.................................................................................. 18

I.    The Department's Treatment of Dalmine and Silcotub as Two
      Separate Entities, Rather than as a Single Collapsed Entity, Is
      Inconsistent with the Agency's Regulation and Past Practice,
      and Is Not Supported By Substantial Evidence............................ 18

      A.    Framework for Treating Affiliated Companies as a
            Collapsed Entity.................................................... 19

      B.    The Regulatory Language, Past Agency Practice, and
            Record Evidence Support the Conclusion that Dalmine
            and Silcotub Have Production Facilities for Similar or
            Identical Products That Would Not Require Substantial
            Retooling of Either Facility in Order to Restructure
            Manufacturing Priorities .......................................... 21

      C.    Record Evidence Ignored by Commerce Demonstrates a
            Significant Potential for Manipulation of Price or
            Production ......................................................... 31

            1.    Level of Common Ownership................................... 31

            2.    Managerial Overlap ......................................... 32

            3.    Whether Operations Are Intertwined ......................... 35

Conclusion ............................................................................... 43

i

NONCONFIDENTIAL

## Table of Contents
(continued)

Page

Pursuant to the Court's rules, and consistent with Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted on pages 8, 28, 29, 32, 33, 36, 37, and 38. The material omitted on pages 8, 28, 29, 36, and 38 includes names of companies that were suppliers and/or customers during the underlying review and were treated as confidential on the record by U.S. Department of Commerce. The material omitted on pages 8, 28, 29, 32, 33, 36, and 37 includes descriptions of Dalmine's production process and/or sensitive commercial information that was reported and treated as confidential on the record by U.S. Department of Commerce.

NONCONFIDENTIAL

Table of Authorities

Page(s)

## Cases

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,
    701 F. Supp. 3d 1321 (Ct. Int'l Trade 2024) ...................................... 30

*Bonney Forge Corp. v. United States*,
    560 F. Supp. 3d 1303 (Ct. Int'l Trade 2022) ...................................... 30

*Clearon Corp. v. United States*,
    Slip Op. 15-91, 2015 Ct. Intl. Trade LEXIS 91
    (Aug. 20, 2015) ................................................................................ 30

*Coalition of American Millwork Producers v. United States*,
    581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) ............................ 19, 33-34

*Goodluck India Ltd. v. United States*,
    670 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) .................................. 5, 27

*Husteel Co. v. United States*,
    491 F. Supp. 2d 1283 (Ct. Int'l Trade 2007) ....................................... 5

*Huvis Corp. v. United States*,
    525 F. Supp. 3d 1370 (Ct. Int'l Trade 2007),
    *aff'd upon remand*, 570 F.3d 1347 (Fed. Cir. 2009) ............................ 6

*Jinan Yipin Corp. v. United States*,
    637 F. Supp. 2d 1183 (Ct. Int'l Trade 2009) ...................................... 30

*Koenig & Bauer-Albert Ag v. United States*,
    90 F. Supp. 2d 1284 (Ct. Int'l Trade 2000) .................................. 18, 19

*Motor Vehicle Ass'n v. State Farm Mut.*,
    463 U.S. 29 (1983) .............................................................................. 5

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ............................................. 4-5, 30, 31

iii

*Queen's Flowers de Colom. v. United States*,
  981 F. Supp. 617 (Ct. Int'l Trade 1997)................................................19

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
  44 F.3d 978 (Fed. Cir. 1994) ...................................................................4


## Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(A)................................................................6

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................4

19 U.S.C. § 1677a ..........................................................................14

19 C.F.R. § 351.401(f) ...........................................................18, 19, 20

19 C.F.R. § 351.401(f)(1)...............................................................21-22

19 C.F.R. § 351.401(f)(2)..............................................................20, 31

19 C.F.R. § 351.401(f)(2)(i) ..............................................................31

19 C.F.R. § 351.401(f)(2)(ii) .............................................................32

19 C.F.R. § 351.401(f)(2)(iii) ............................................................35


## Administrative Determinations

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy
  Steel From Italy: Final Results of Antidumping Duty
  Administrative Review; 2021-2022*, 89 Fed. Reg. 1,523
  (Dep't Commerce Jan. 10, 2024) ("*Final Results*") and the
  accompanying *Issues and Decision Memorandum for the
  Final Results of the Administrative Review of the
  Antidumping Duty Order on Certain Cold-Drawn
  Mechanical Tubing of Carbon and Alloy Steel from Italy;
  2021-2022* (Dep't Commerce Jan. 3, 2024) ("*IDM*") .................. *passim*

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy
    Steel From Italy: Preliminary Results of Antidumping
    Duty Administrative Review; 2021-2022*,
    88 Fed. Reg. 43,281 (Dep't Commerce July 7, 2023)
    ("*Preliminary Results*") and accompanying *Decision
    Memorandum for the Preliminary Results of the
    Administrative Review of the Antidumping Duty Order on
    Certain Cold-Drawn Mechanical Tubing of Carbon and
    Alloy Steel from Italy; 2021-2022* (June 30, 2023)................. 10, 11, 12

*Final Results of Redetermination Pursuant to Court Remand*
    (Dep't Commerce Dec. 19, 2024) ("*Remand Results*").............. *passim*

*Issues and Decision Memorandum for the Final Affirmative
    Determination in the Less-Than-Fair-Value Investigation
    of Utility Scale Wind Towers from Malaysia*
    (Dep't Commerce Oct. 6, 2021),
    *ref'd in Utility Scale Wind Towers From Malaysia:
    Final Affirmative Determination of Sales at Less Than
    Fair Value*, 86 Fed. Reg. 56,894
    (Dep't Commerce Oct. 13, 2021) ..................................................23, 24

*Issues and Decision Memorandum for the Final Results in
    the 2016-2018 Antidumping Duty Administrative Review
    of Carbon and Alloy Steel Cut-to-Length Plate from the
    Republic of Korea* (Dep't Commerce Dec. 16, 2019),
    *ref'd in* 84 Fed. Reg. 70,951 (Dec. 26, 2019) .......................................34

NONCONFIDENTIAL

*Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan:*
*Circumvention Inquiry – Preliminary Affiliation and Collapsing*
*Memorandum* (Apr. 6, 2023) ...........................................................25

Memorandum, "Administrative Review of the Antidumping Duty Order
on Steel Concrete Reinforcing Bar from Mexico: Preliminary
Collapsing Memorandum for Deacero Group," dated November 30,
2022 ...............................................................................................35-36

Memorandum, "Antidumping Duty Administrative Review of
Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into
Modules, from the People's Republic of China: Affiliation and
Collapsing Memorandum for Jinko Solar Import and Export Co.,
Ltd.," dated April 16, 2021 ....................................................26, 27, 40

Memorandum, "Less-Than-Fair-Value Investigation of Seamless
Refined Copper Pipe and Tube from the Socialist Republic of
Vietnam: Affiliation and Single Entity Treatment Memorandum,"
dated January 26, 2021 ...............................................................34, 40

## Miscellaneous

*Antidumping Duties; Countervailing Duties: Final Rule*,
62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997).........................21

**NONCONFIDENTIAL**

Glossary

| Acronym | Item |
|---|---|
| Dalmine | Dalmine S.p.A. |
| *Final Results* | *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From Italy: Final Results of Antidumping Duty Administrative Review; 2021-2022,* 89 Fed. Reg. 1,523 (Dep't Commerce Jan. 10, 2024) |
| Plaintiffs/Petitioners | ArcelorMittal Tubular Products, Michigan Seamless Tube, LLC, Webco Industries, Inc., and Zekelman Industries, Inc. |
| *Preliminary Results* | *Preliminary Results. See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From Italy: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022,* 88 Fed. Reg. 43,281 (Dep't Commerce July 7, 2023) |
| *Remand Results* | *Final Results of Redetermination Pursuant to Court Remand* (Dec. 19, 2024) |
| Silcotub | S.C. Silcotub S.A. |
| Tubing or CDMT | Certain cold-drawn mechanical tubing |

NONCONFIDENTIAL

On behalf of ArcelorMittal Tubular Products, Michigan Seamless Tube, LLC, Webco Industries, Inc., and Zekelman Industries, Inc. (collectively, "Plaintiffs" or "Petitioners"), we submit this Memorandum of Law in Support of Plaintiffs' Motion for Judgment Upon the Agency Record. Plaintiffs urge this Court to determine that the U.S. Department of Commerce's (the "Department" or "Commerce") final results, and subsequent remand results, in the fourth administrative review of the antidumping duty order on certain cold-drawn mechanical tubing of carbon and alloy steel ("CDMT" or "tubing") from Italy are not supported by substantial evidence and are not otherwise in accordance with law, and to remand the agency's determination for further proceedings.

## Administrative Determination Under Review

Plaintiffs challenge certain aspects of the Department's final results and remand results in the fourth administrative review of the antidumping duty order on certain cold-drawn mechanical tubing of carbon and alloy steel from Italy. *See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From Italy: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg.

1,523 (Dep't Commerce Jan. 10, 2024) ("*Final Results*") (Appx1012-1013) and the accompanying *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy; 2021-2022* (Dep't Commerce Jan. 3, 2024) ("*IDM*") (Appx1000-1011); *see also Final Results of Redetermination Pursuant to Court Remand* (Dep't Commerce Dec. 19, 2024) (ECF No. 44) ("*Remand Results*") (Appx7759-7769).

## <u>Issue Presented and Summary of Argument</u>

Plaintiffs challenge one aspect of the Department's findings in the *Final Results* and *Remand Results*.

1)  **Is the Department's treatment of affiliated parties Dalmine and Silcotub as two separate entities, rather than a single collapsed entity, supported by substantial evidence?**

No. The Department's treatment of mandatory respondent Dalmine S.p.A. ("Dalmine") and its Romanian affiliate, S.C. Silcotub S.A. ("Silcotub"), as two separate entities, rather than as a single collapsed entity, is not supported by substantial evidence. The Department determined not to collapse Dalmine and Silcotub despite recognizing that certain regulatory factors were met, because: (i) it did not consider

NONCONFIDENTIAL

Silcotub to be a producer of subject merchandise or a producer that has the ability to produce such merchandise through minor alterations to its facilities; (ii) it did not find evidence of the potential for significant manipulation of price or production; (iii) it did not find evidence of managerial overlap between Dalmine and Silcotub; and (iv) it did not find evidence that the operations of Dalmine and Silcotub are intertwined through the sharing of facilities or employees.

In reaching these conclusions, the Department misapplied the regulatory standard, ignored relevant past practice, and failed to consider material record evidence. Specifically, by finding that Dalmine and Silcotub should not be collapsed by virtue of Silcotub's location in Romania the Department imposed a heighted standard for collapsing two entities that does not exist in the regulatory language. Indeed, Plaintiffs cited case precedent in which the agency had collapsed affiliated entities under similar fact patterns. In the *Remand Results*, the Department either ignored its own precedent or unconvincingly attempted to distinguish past decisions without addressing other material record facts that detract from its decision not to collapse Dalmine and Silcotub.

NONCONFIDENTIAL

Consequently, the Department's decision not to collapse affiliates Dalmine and Silcotub in the *Final Results* and *Remand Results* is not supported by substantial evidence. Because the Department's decision misapplies the regulatory language, is inconsistent with prior agency decisions, and fails to consider material record evidence, the *Remand Results* should be remanded again to the agency for further findings.

## Standard of Review

This Court must hold unlawful any aspect of the Department's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "'more than a mere scintilla'" and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence exists, the Court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379

NONCONFIDENTIAL

(Fed. Cir. 2003) (quoting *Atl. Sugar. Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

The standard also requires the Department to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983); *see also Husteel Co. v. United States*, 491 F. Supp. 2d 1283, 1291-93 (Ct. Int'l Trade 2007) (finding the agency's determination unsupported by substantial evidence because the agency "did not provide a reasoned explanation supported by a stated connection between the facts found and the choices made . . . .") (citation omitted).

"Agency action that deviates from prior policy decisions or established practice without reasoned justification is arbitrary and capricious." *Goodluck India Ltd. v. United States*, 670 F. Supp. 3d 1353, 1374 (Ct. Int'l Trade 2023) (citing *Huvis Corp. v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007); *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1347 (Ct. Int'l Trade 2022)).

NONCONFIDENTIAL

In addition, the Court will find the Department's action to be not in accordance with law when that decision is contrary to statute, regulation, precedent, or procedures. *Huvis Corp. v. United States*, 525 F. Supp. 3d 1370, 1374 (Ct. Int'l Trade 2007), *aff'd upon remand*, 570 F.3d 1347, 1353 (Fed. Cir. 2009). This Court must hold as unlawful any decision by the Department that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(A).

## Statement of Facts

The Department initiated its fourth administrative review of the antidumping duty order on certain cold-drawn mechanical tubing ("tubing") of carbon and alloy steel from Italy on August 9, 2022. Appx7236-7241. The Department selected Dalmine as the sole mandatory respondent in the review and issued the initial antidumping duty questionnaire on August 26, 2022. Appx7257-7439.

Dalmine submitted responses on behalf of itself as well as its affiliated U.S. importer Tenaris Global Services. Appx1016. In its initial response to Section A of the Department's questionnaire, Dalmine explained that during the period of review, Dalmine's affiliate Silcotub

produced hollows (*i.e.*, blank tubes for cold drawing) in Romania and sold them to Dalmine to produce subject tubing in Italy. Appx1030. Dalmine also explained that its U.S. sales included subject merchandise produced by Dalmine shipped from Italy to the United States as well as subject merchandise that was produced by Dalmine, sold to Dalmine's affiliate Silcotub, cut by Silcotub, and shipped from Romania to the United States. Appx1025. In its initial response to Section D of the Department's questionnaire, Dalmine confirmed that Silcotub is one of its sources for the hollows used in the production of subject merchandise in Italy and that Silcotub produced these hollows in Romania. Appx2946.

After Dalmine filed its initial questionnaire response, Petitioners filed comments urging the Department to gather additional information from both Dalmine and its affiliate Silcotub and to consider whether to treat the two companies as a single entity. Appx3237-3241. Whether two affiliated companies are "collapsed" and treated as a single entity has a significant bearing on how each company's costs are assessed and treated by the Department. Dalmine's Section A response contained information demonstrating a high level of operational integration

**CONFIDENTIAL**
**MATERIAL OMITTED**                 NONCONFIDENTIAL

between the two companies. For example, Dalmine reported that from

"an operational point of view, the Tenaris Group companies, including

Dalmine, Silcotub, TGS Uruguay, and TGS USA *act like an integrated

company* using consolidated software, such as SAP, and procedures."

Appx1035 (emphasis added). In addition, Dalmine reported:

Silcotub   has   a   [

*production process*

].  At  [

]  The  [

]

Appx1031. Dalmine further reported that the "Steel Shop and Hot

Rolling Mill in Dalmine's facility in Dalmine, Italy produces {} blank

pipes (i.e., hollows) supplied to Costa Volpino. . . {and} the remainder of

the hollows used as an input to produce {tubing} in Costa Volpino is

purchased from the affiliated Romanian company Silcotub." Appx2946.

In light of this initial reporting and evidence, Petitioners urged the

Department to require Dalmine to "report all of Silcotub's costs and

sales as a collapsed entity," including "reporting the CONNUM-specific manufacturing costs for Silctub's hollows," "Silcotub's production process for subject and non-subject merchandise," and "Silcotub's costs and sales reconciliations." Appx3240-3241. As Petitioners explained, this would allow the Department to determine the full cost of Dalmine and Silcotub as "an integrated company," rather than to compare the market price of Silcotub's hollows to the average per-unit cost of production. *Id.* Accordingly, as Petitioners argued, Dalmine should fully report its costs for the hollows that it purchased from Silcotub and used in the production of subject merchandise. *Id.* Petitioners explained that this evidence demonstrated that the production facilities of Dalmine and its affiliate Silcotub are thoroughly intertwined in the production of subject merchandise from the production of the major input to product finishing and shipments to U.S. customers, and via integrated operational controls. *Id.*

While the Department did issue supplemental questionnaires to Dalmine prior to the preliminary results on other issues, it failed to request the additional cost of production information for Silcotub as

Petitioners proposed. *See* Appx3261-3266; Appx3502-3507; Appx3644-3650; Appx3895-3898.

Prior to the preliminary results, Petitioners filed comments on June 1, 2023, and again urged the Department to treat Dalmine and Silcotub as a single entity based on prior agency practice and the record evidence that supported a collapsing finding. Appx3874-3894; Appx7623-7643.[1] Petitioners' June 1 Comments also requested that the Department issue a supplemental questionnaire to Dalmine after the preliminary results and in advance of the Department's scheduled verification in Italy, instructing Dalmine to report Silcotub's cost of production for the hollows transferred to Dalmine. Appx3889.

On June 30, 2023, the Department published the *Preliminary Results. See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From Italy: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43,281 (Dep't

---

[1] The Department originally rejected this submission several weeks before issuance of the *Final Results* for allegedly containing new factual information in the form of prior agency decision memoranda. The Department, however, reconsidered that position and accepted the submission in its original form during the remand proceeding. Appx 7623-7643.

NONCONFIDENTIAL

Commerce July 7, 2023) (hereinafter, "*Preliminary Results*")
(Appx7522-7524), and accompanying *Decision Memorandum for the*
*Preliminary Results of the Administrative Review of the Antidumping*
*Duty Order on Certain Cold-Drawn Mechanical Tubing of Carbon and*
*Alloy Steel from Italy; 2021-2022* (June 30, 2023) (Appx7503-7521). In
the *Preliminary Results*, the Department treated Dalmine and Silcotub
as separate entities for purposes of calculating the dumping margin and
did not address or otherwise mention Petitioners' argument to collapse
the two companies, the extensive record evidence supporting a
collapsing finding, or its regulations and practice governing the
collapsing of affiliated entities. Appx7507-7520 (discussion of
preliminary methodology). The Department also ignored Petitioners'
request to issue a supplemental questionnaire to Dalmine in advance of
the verification. Thereafter, the Department conducted on-site
verification of Dalmine's responses in Italy in July 2023. Appx7525.

On September 25, 2023, Petitioners filed a timely administrative
case brief with the Department. Appx6808-6830. The *sole* focus of
Petitioners' Case Brief urged the Department to conduct a collapsing
analysis, and to consider the record evidence supporting such a finding.

*See generally id.* Dalmine also filed a timely case brief, raising issues not subject to this appeal. *See* Appx6798-6807. Thereafter, both Petitioners and Dalmine filed timely rebuttal briefs. Appx6846-6857; Appx6831-6845.[2]

On January 10, 2024, the Department published the *Final Results*. Appx1012-1013. In its analysis, the Department found that Dalmine and Silcotub are affiliated, thereby satisfying the first collapsing criterion. Appx1006. The Department also "recognize{d} that certain elements necessary for single entity treatment are present in this proceeding," however, the agency did not find it "necessary" to collapse the two companies. Appx1008. Specifically, with respect to the second collapsing criterion (whether the producers have production facilities for producing similar or identical products that would not require substantial retooling of either facility), the Department found that

---

[2]    During December 2023, the Department twice rejected Petitioners' case brief for allegedly containing new factual information in the form of citations to prior agency decisions and the accompanying memoranda. Appx7550-7552; Appx7559-7561. The Department also rejected Dalmine's rebuttal brief for referencing the same set of memoranda in response to Petitioners' arguments. Petitioners filed two requests for reconsideration of those rejections. Appx7553-7558; Appx7563-7575. The Department also held a virtual meeting with Petitioners' counsel regarding this issue on December 21, 2023. Appx7579.

because Silcotub's production operations are based in Romania, it is not a producer of subject merchandise and does not have the ability to produce such merchandise through minor alterations to its facilities. Appx1007. The Department did not otherwise consider or analyze the record evidence cited in Petitioners' case brief (Appx7653-7656) regarding this factor, including the high level to which the two affiliates' sales and production operations are intertwined, Dalmine's production of subject CDMT as well as hollows that are the primary input used in the production of CDMT and Silcotub's production of hollows that it sells to Dalmine and that are ultimately used by Dalmine for the production of subject CDMT, the companies' cutting operations for subject merchandise and sales to the U.S. market, all of which indicate that substantial retooling of each company's facility is not required. Appx1007-1008.

With respect to the final collapsing criterion (whether there is a significant potential for manipulation of price or production), the Department acknowledged that Dalmine and Silcotub are wholly-owned by the same company and have significant transactions between them related to the production and sale of Italian cold-drawn mechanical

tubing, including the subject sales to the United States. *Id.* The
Department concluded, however, that the record evidence did not
demonstrate that Dalmine and Silcotub have any overlap in
management or have common members on their Boards of Directors or
share facilities or employees. Appx1007-1008.

Furthermore, the Department explained that "the potential for
manipulation of price does not currently exist because: (1) Silcotub does
not export, to the United States, Italian cold-drawn mechanical tubing
produced by any other company than Dalmine; (2) Dalmine has fully
reported Silcotub's downstream sales of Dalmine's cold-drawn
mechanical tubing in its U.S. sales database, as required by section 772
of the Act {19 U.S.C. § 1677a}; and (3) Silcotub does not have its own
cash deposit rate (thereby creating the potential for the companies to
export under the more advantageous of the two rates)." Appx1008
(emphasis added). The Department found no potential for manipulation
of production because: "(1) Silcotub is located in Romania and cannot
produce subject merchandise or foreign like product; and (2) Dalmine
fully reported all production-related transactions with Silcotub, and
these transactions are subject to the special rules for affiliated party

costs." *Id.* Based on this analysis, the Department continued to treat Dalmine and Silcotub as separate entities. *Id.* Again, nowhere in the Department's analysis does it discuss or analyze the extensive record evidence cited in Petitioners' case brief (Appx7659-7663) demonstrating the intertwined operations of the two companies, including the sharing of significant sales information, overlapping logistical functions, confidential details regarding the transferring back and forth of CDMT between the companies, and the nature of both companies' production and sales involvement for CDMT sold in the Unites States. Appx1008.

Petitioners filed a timely appeal of the *Final Results* with the Court. *See* ECF No. 1. On July 19, 2024, Plaintiffs filed their opening Rule 56.2 brief and accompanying motion for judgment on the agency record. ECF No. 36. On September 26, 2024, the Government filed a motion seeking a voluntary remand to "reconsider its previous position" as set forth in the final results. ECF No. 40. The Court granted the Government's motion on September 27, 2024 and remanded the case to the Department for further proceedings. ECF No. 41.

During the remand proceeding, Commerce requested that Petitioners submit to the record the memoranda at issue and re-file the original

NONCONFIDENTIAL

versions of their pre-preliminary results comments and administrative case brief. Appx7669-7670. The Department also requested that Dalmine re-file its originally submitted rebuttal brief. Appx7670.  The parties submitted the requested documentation to the record:

- Petitioners' June 1 pre-preliminary results comments (Appx7623-7643);

- Petitioners' case brief (Appx7645-7667);

- The memoranda discussed in those two submissions (Appx7671-7758); and

- Dalmine's rebuttal brief (Appx7598-7618).

Commerce issued no draft remand results to the parties for comment before issuing the final *Remand Results* on December 19, 2024. Appx7759-7769. In the *Remand Results*, the Department again declined to collapse Dalmine and Silcotub to a single entity, and declined to collect the necessary cost data that would accompany such a finding. While the Department accepted Petitioners' citations to prior agency decisions and memoranda to the record, its analysis of those cases and their impact on this record remains deficient. In its analysis of the regulatory factors, the Department largely repeats its findings from the *Final Results*, providing block quotes to those findings without new

analysis of the prior agency decisions involving similar fact patterns. Appx7766-7767. Instead of truly weighing the impact of prior agency decisions on this case, the Department summarily dismisses those cases by claiming they are distinguishable because here Silcotub is located in Romania and cannot produce *Italian* cold-drawn mechanical tubing. Appx7766-7768. This ignores that it both produced the primary input (mechanical tubing hollows) and finished the Italian drawn products by cutting them to length before shipping them to the United States. In addition, while the Department claims to have based its decision on the "totality of the circumstances," its analysis simply re-adopts the *Final Results* and ignores the numerous material facts (discussed just above) that demonstrate Dalmine and Silcotub should be treated as a single entity.

Plaintiffs now file this revised opening brief pursuant to USCIT Rule 56.2 challenging the Department's findings in the *Remand Results*.

<u>Argument</u>

I.   <u>The Department's Treatment of Dalmine and Silcotub as Two
     Separate Entities, Rather than as a Single Collapsed Entity, Is
     Inconsistent with the Agency's Regulation and Past Practice, and
     Is Not Supported By Substantial Evidence</u>

The Department's failure to treat Dalmine and Silcotub as a

collapsed entity results in the absence of critical cost information from

the record, is inconsistent with the Department's own regulations at 19

C.F.R. § 351.401(f) and past agency practice, and is otherwise not

supported by record evidence. The issue of collapsing is crucial to the

Department's collection and treatment of the costs of two affiliated

entities. Commerce itself acknowledged the "importance of this issue" in

the *Final Results*. Appx1008. Indeed, the standard of cost reporting for

a collapsed entity is higher and more detailed than the standard of

reporting for affiliated entities. *See Koenig & Bauer-Albert Ag v. United

States*, 90 F. Supp. 2d 1284, 1290 (Ct. Int'l Trade 2000) ("As described

by Commerce, 'collapsing, as it relates to computing COP, is a specific

rule dealing with whether the Department should include facilities

owned by an affiliate in its weighted-average, CONNUM-specific COP

computation.'") (citation omitted). The question of whether to collapse

affiliated parties and fully consider costs is also critical to avoid

NONCONFIDENTIAL

manipulation of cost reporting. *Id.* ("Commerce collapses facilities to prevent the possibility of manipulation of the antidumping law through shifting production to a less expensive, affiliated facility.") (citation omitted); *see, e.g., Queen's Flowers de Colom. v. United States*, 981 F. Supp. 617, 622 (Ct. Int'l Trade 1997) ("Commerce treats closely related parties as a single entity in order to 'ensure that {the agency} reviews the entire producer or reseller, not merely a part of it.'" (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (1990) (the "basic purpose of the statute {is to} determine{e} current margins as accurately as possible.")); *Coalition of American Millwork Producers v. United States*, 581 F. Supp. 3d 1295, 1303 (Ct. Int'l Trade 2022). As Plaintiffs argued throughout the review, the Department should have collapsed the two affiliated entities and sought additional cost information regarding Silcotub's operations. Appx3240-3241, Appx3875, and Appx3889.

### A. Framework for Treating Affiliated Companies as a Collapsed Entity

The Department's practice of collapsing affiliated producers is codified in 19 C.F.R. § 351.401(f), which states the following:

NONCONFIDENTIAL

> {T}he Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is significant potential for manipulation of price or production.

*See* 19 C.F.R. § 351.401(f).[3] The Department's regulations at 19 C.F.R. § 351.401(f)(2) further explain the three factors it will evaluate for assessing the "significant potential for manipulation of price or production":

> In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:
>
> (i) The level of common ownership;
>
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
>
> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

*Id.* at § 351.401(f)(2).

---

[3]   Plaintiffs rely on the 2021 version of 19 C.F.R. § 351.401(f) because that version was in effect during the underlying administrative review.

NONCONFIDENTIAL

Additionally, the *Preamble* to the final regulations explains that this list of factors is "non-exhaustive" meaning the Department may consider other record evidence relevant to its analysis. *See Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,345-46 (Dep't Commerce May 19, 1997) ("*Preamble*"). Nothing in the regulation expressly limits the collapsing decision operations in the same country. The *Preamble* also states that the Department "has not adopted the suggestion that it will collapse only in 'extraordinary' circumstances. A determination of whether to collapse should be based upon an evaluation of the factors listed in paragraph (f), and not upon whether fact patterns calling for collapsing are commonly or rarely encountered." *Id.*

**B.**  **The Regulatory Language, Past Agency Practice, and Record Evidence Support the Conclusion that Dalmine and Silcotub Have Production Facilities for Similar or Identical Products That Would Not Require Substantial Retooling of Either Facility in Order to Restructure Manufacturing Priorities**

The Department's regulations, past agency practice, and record evidence all demonstrate that affiliated companies Dalmine and Silcotub have production facilities for similar or identical products that would not require substantial retooling of either facility in order to

NONCONFIDENTIAL

restructure manufacturing priorities, thereby satisfying the second condition for collapsing pursuant to 19 C.F.R. § 351.401(f)(1).[4] Commerce's analysis of this factor suffers from several material flaws such that remand is required.

First, Commerce misreads the regulation by imposing a heightened standard for collapsing two entities that does not exist in the regulatory language. Section 351.401(f)(1), in relevant part, states that Commerce will treat two or more affiliated companies as a single collapsed entity "where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities . . . ." 19 C.F.R. § 351.401(f)(1). Nowhere in the regulation does it state that both affiliated parties must be located in the subject country or produce subject merchandise to be treated as a collapsed entity, yet Commerce's entire analysis of this factor is focused on Silcotub being located in Romania and thus not producing subject merchandise. Appx1007; Appx7765-7766. Indeed, aside from citing to the memoranda Plaintiffs

---

[4]   The Department agreed that Dalmine and Silcotub are affiliated, thereby satisfying the first condition of 19 C.F.R. § 351.401(f)(1). *See* Appx1006.

NONCONFIDENTIAL

relied upon, the Department cites no authority to support its claim that Silcotub's location in Romania disqualifies it from being collapsed with Dalmine. *See* Appx7765-7768. Nothing in the regulatory language expressly limits collapsing to facilities located only in the subject country.

Moreover, past agency decisions cited by Plaintiffs demonstrate that the collapsing regulation does not require that the affiliated parties be located in the subject country and produce subject merchandise, but rather provides for collapsing when companies have the capability to produce similar or identical products. For example, in *Utility Scale Wind Towers from Malaysia*, the Department collapsed respondent C.S. Wind Malaysia with its Korean parent company C.S. Wind Corporation, despite the fact that the parent company was a Korean entity and was not engaged in the production of subject merchandise. *See Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Malaysia* (Dep't Commerce Oct. 6, 2021) at Comment 1, *ref'd in Utility Scale Wind Towers From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 56,894 (Dep't Commerce

Oct. 13, 2021) (cited in App7655 at n.23). In that case, Commerce explained that "where non-producing entities (*e.g.*, exporters) are affiliated, and there exists a significant potential for manipulation of prices and/or export decisions, Commerce has considered such entities, as well as any other affiliated entities (where appropriate), as a single entity. . . ." *Id.* at 6. Notably, Commerce *rejected* the argument that collapsing was inappropriate because C.S. Wind Corporation did not have a production facility in Malaysia and explained "{w}e disagree with the petitioner that Commerce should reach a different conclusion *solely because CS Wind Corporation does not have a production facility in Malaysia* and CS Wind Malaysia is the only producer in Malaysia." *Id.* (emphasis added). This case squarely supports the notion that collapsing can be applied even when one of the affiliates is not located in the subject country. Although Commerce acknowledged Plaintiffs' citation to the *Wind Towers* case, the agency did not distinguish that case or explain why here it arbitrarily required that both affiliated companies be located in the subject country for the collapsing regulation to apply. Appx1007-1008; Appx7765-7768.

NONCONFIDENTIAL

Further, in *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, the Department found that when two entities produced similar products and had the ability to produce identical products, they did in fact have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities. *See Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan; Circumvention Inquiry – Preliminary Affiliation and Collapsing Memorandum* (Apr. 6, 2023) at 5-6) (Appx7744-7745). In that case, one affiliate was located in Taiwan and the other affiliate was located in Vietnam, and the Department found that both affiliated entities "have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." *Id.* Commerce attempts to distinguish this case because it was a circumvention inquiry (Appx7766 and n.36), however, the type of proceeding does not impact the applicability of the collapsing regulation, which applies with equal force. As Plaintiffs here argued to the Commerce, the relevant question is whether producers have production facilities for similar or identical products that would not

NONCONFIDENTIAL

require substantial retooling of either facility in order to restructure manufacturing priorities such that the Department should collapse the two companies and solicit additional cost information from Silcotub. Although the ultimate finding in a circumvention proceeding may be different, the analysis of this regulatory factor is the same and does not require that both affiliates be located in the same country.

Additional agency decisions demonstrate that both affiliates need not produce subject merchandise, a requirement that, again, is found nowhere in the regulation. In *Solar Cells from China*, the Department included in the collapsed entity a non-producing exporter of subject merchandise in the non-market economy context. Appx7726 (Memorandum, "Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, from the People's Republic of China: Affiliation and Collapsing Memorandum for Jinko Solar Import and Export Co., Ltd.," dated April 16, 2021). Critically, in that case, the Department explicitly acknowledged that the regulation does not exclude parties that do not produce subject merchandise from the collapsing analysis:

NONCONFIDENTIAL

> Thus, although Commerce's regulations do not address the treatment of nonproducing entities (e.g., exporters), where non-producing entities are affiliated, and there exists a significant potential for manipulation of process and/or export decisions, Commerce has considered such entities, as well as other affiliated entities (where appropriate), as a single entity.

*Id.* In other words, the regulation does not prevent the collapsing of affiliated entities one of which does not produce subject merchandise.

By focusing on Silcotub's location in Romania instead of examining the correct regulatory inquiry of whether the two companies are producers that have production facilities for producing similar or identical products that would not require substantial retooling of either facility, Commerce's analysis in the *Remand Results* is inconsistent with the agency's own regulatory standard and its past precedent. *Goodluck India*, 670 F. Supp. 3d at 1374 ("Agency action that deviates from prior policy decisions or established practice without reasoned justification is arbitrary and capricious.") (citing *Huvis Corp. v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). To the extent Commerce claims that it does not collapse entities that are not

producers of subject merchandise located in the subject country, the

cases cited by Plaintiffs demonstrate that the agency has acted

inconsistently in the past when applying the collapsing regulation.

Second, applying the correct regulatory standard demonstrates

this factor is satisfied because Dalmine and Silcotub have production

facilities for identical merchandise that would not require substantial

retooling to restructure their manufacturing priorities. Dalmine

produces subject merchandise as well as the hollows used in the

production of subject merchandise and Silcotub also produces hollows

used in the production of subject merchandise by Dalmine. Appx1030-

1031, Appx2945-2946, and Appx6816-6817. Silcotub performs cutting

on subject tubing sold to it by Dalmine, that is ultimately shipped to

one of Dalmine's customers in the United States. Appx1028. Dalmine

also [                    *production process*

                    ] Appx1031. Dalmine and Silcotub both

produce hollows that are used in the production of subject tubing, and

both perform cutting on subject tubing. For example, Dalmine explains

that for "hollows produced at Silcotub, the billet is produced at the steel

shop in Romania and then transformed into hollows in the rolling mill

**CONFIDENTIAL
MATERIAL OMITTED**        NONCONFIDENTIAL

at Silcotub's plant in Zalau." Appx3661. Similarly, for "hollows produced at Dalmine, the production starts with the billet produced at Dalmine's steel shop . . . {the} next step is the rolling of the billet to obtain the hollow, which is performed at Dalmine's [

   *production process*                    ] Appx3660-3661.  This record evidence demonstrates that both Dalmine and Silcotub conduct operations for the production of similar, and in some instances identical, merchandise and have production facilities that would not require substantial retooling to restructure their manufacturing facilities.

   Commerce appears to have ignored all of this evidence in its analysis and disqualified collapsing due solely to Silcotub's location in Romania based on a requirement that does not actually exist in the regulation and has not been applied to other cases in practice. Appx1007; App7764-7768. Indeed, the public nature of the *Remand Results* suggests that Commerce did not consider the confidential evidence on the record demonstrating that the two affiliates have overlapping production facilities for producing similar or identical products that

NONCONFIDENTIAL

would not require substantial retooling of either facility.[5] None of this evidence is discussed or addressed in the *Remand Results*. The agency must address significant evidence and arguments raised in the proceeding, and its failure to do so deprives the court of a reasoned basis on which to evaluate the agency's decision. *See Nippon Steel*, 337 F.3d at 1379 (quoting *Atl. Sugar.*, 744 F.2d at 1562).

Remand is warranted with respect to this factor of the collapsing analysis because the *Final Results* and *Remand Results* apply the wrong regulatory standard, are inconsistent with past agency practice,

---

[5]   *See Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 701 F. Supp. 3d 1321, 1331, 1333 (Ct. Int'l Trade 2024) (remanding in part for Commerce's failure to address two of the Association's "relevant arguments"); *Bonney Forge Corp. v. United States*, 560 F. Supp. 3d 1303, 1310 (Ct. Int'l Trade 2022) ("The Federal Circuit has thus found that the Court of International Trade properly remanded determinations when Commerce 'fail{ed} to consider all relevant arguments' made by the parties.") (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1119-20 (Fed. Cir. 2004)); *Clearon Corp. v. United States*, Slip Op. 15-91 at 56-57, 2015 Ct. Intl. Trade LEXIS 91, at *92 (Aug. 20, 2015) ("Arch raised this last point in its comments on the Draft Remand, and it is an argument of cogent materiality that Commerce failed to address, requiring remand for that reason as well.") (citing *e.g., United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 252 (2d Cir. 1977) ("{i}t is not in keeping with the rational {agency} process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered."); *Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1191 (Ct. Int'l Trade 2009).

and fail to address the contrary facts raised by the plaintiff that detract from the agency's findings.

### C.   Record Evidence Ignored by Commerce Demonstrates a Significant Potential for Manipulation of Price or Production

With respect to the third regulatory factor, whether there is significant potential for manipulation of price or production, the Department's practice "does not require that all three factors of 19 C.F.R. § 351.401(f)(2) be present in order to find potential for manipulation of price or production" and the Department considers the totality of circumstances in its analysis. Appx6819-6820; Appx7767. In any case, Plaintiffs administrative case brief explained that all three factors for evaluation of significant potential for manipulation of price or production are satisfied here. Appx6820; Appx7657. The Department's analysis impermissibly ignores material record evidence that detracts from its decision not to collapse Dalmine and Silcotub. *Nippon Steel*, 337 F.3d at 1379.

### 1.   Level of Common Ownership

The first factor the Department examines pursuant to 19 C.F.R. § 351.401(f)(2)(i) is "{t}he level of common ownership" among the affiliated companies. Here, Dalmine and Silcotub are owned by the

CONFIDENTIAL
MATERIAL OMITTED                    NONCONFIDENTIAL

same parent company. In the *Final Results*, the Department

acknowledged that Dalmine and Silcotub are wholly owned by the same

company and have "significant transactions between them related to

the production and sale of Italian cold-drawn mechanical tubing."

Appx1007. Commerce cited no other contrary evidence regarding this

factor. Accordingly, this factor is met.

### 2.    Managerial Overlap

The second factor the Department examines pursuant to 19 C.F.R.

§ 351.401(f)(2)(ii) is "{t}he extent to which managerial employees or

board members of one firm sit on the board of directors of an affiliated

firm."                    *managerial information*

The record demonstrates [

*managerial information*                    ] For example,

the operating structure organization charts in of Dalmine's initial

section A questionnaire response indicate that while the [


*managerial information*


] Appx1068-1069. Similarly, while the [

-32-

**CONFIDENTIAL
MATERIAL OMITTED**    NONCONFIDENTIAL

*managerial information*

] *Id.* These facts supported a finding of
managerial overlap, were raised below, and not addressed by the
Department.

In its *Final Results* the Department simply stated there is no
evidence of managerial overlap between Dalmine and Silcotub, "nor is
there evidence that they have common members on their Boards of
Directors or share facilities or employees." Appx1007-1008. Commerce
did not even cite to, much less analyze, the confidential record evidence
discussed above and its impact on the analysis of this regulatory factor.

Even if the Department had considered all the record evidence and
still concluded this regulatory factor was not met, the agency previously
has collapsed affiliated entities in instances where it determined that
there was insufficient evidence of managerial overlap between the
relevant entities. *See Coalition of American Millwork Producers v.
United States*, 581 F. Supp. 3d 1295, 1305-06 (Ct. Int'l Trade 2022)
("Commerce need not find all of the factors in the regulation present to

-33-

find a significant potential for manipulation of price or production.")
(citing *U.S. Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1139
(Ct. Int'l Trade 2016)). In both *Seamless Refined Copper Pipe and Tube
from the Socialist Republic of Vietnam* and *Carbon and Alloy Steel Cut-
to-Length Plate from Korea*, the Department collapsed affiliated
companies into a single entity despite the affiliated companies having
no overlap between managerial employees. *See* Appx7718-7719
(Memorandum, "Less-Than-Fair-Value Investigation of Seamless
Refined Copper Pipe and Tube from the Socialist Republic of Vietnam:
Affiliation and Single Entity Treatment Memorandum," dated January
26, 2021); *Issues and Decision Memorandum for the Final Results in
the 2016-2018 Antidumping Duty Administrative Review of Carbon and
Alloy Steel Cut-to-Length Plate from the Republic of Korea* at Comment
1 (Dep't Commerce Dec. 16, 2019), *ref'd in* 84 Fed. Reg. 70,951 (Dec. 26,
2019) (final results).

The Department largely ignored prior precedent and acknowledged
Plaintiffs' citation to *Copper Pipe and Tube from Vietnam* only in
passing in the *Remand Results* (Appx7767 n.40) without analysis or an

assessment how the circumstances in past cases impact the analysis in this administrative review. *Id.*

### 3.    Whether Operations Are Intertwined

The third factor the Department examines pursuant to 19 C.F.R. § 351.401(f)(2)(iii) is "{w}hether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers."

The Government's request for a voluntary remand stated that "if plaintiffs' previously-rejected submissions are placed on the administrative record, Commerce will need to consider plaintiffs' accompanying arguments for purposes of the agency's single-entity determination with respect to Dalmine and Silcotub." ECF Doc. 40. Yet, the *Remand Results* analysis is simply a block quote adopting the Department's findings from the *Final Results* and a brief discussion of the agency's prior decision in *Rebar from Mexico*. Appx7767-7766 (Memorandum, "Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Mexico: Preliminary Collapsing Memorandum for Deacero Group," dated November 30, 2022). The

**CONFIDENTIAL**
**MATERIAL OMITTED**    NONCONFIDENTIAL

Department's additional remand analysis of *Rebar from Mexico* again hinges solely on the fact that Silcotub is located in Romania. *Id.*

This inadequate analysis ignores substantial record evidence supporting Petitioners' position. First, the record demonstrates, *and the Department acknowledged* elsewhere in its findings, that Dalmine and Silcotub share significant sales information. Appx1007. In the *Final Results*, the Department explained that "Dalmine and Silcotub share significant sales information, with certain sales of subject merchandise during the POR made from Dalmine via Silcotub (and other affiliates) to unaffiliated U.S. customers." Appx1007, n.34 (internal citation omitted).

Second, evidence demonstrates that the production facilities of Dalmine and Silcotub are thoroughly intertwined to produce subject merchandise. Specifically, the record evidence is that both Dalmine and Silcotub produce hollows (tube blanks) that are the major input of the subject merchandise produced in Italy for Dalmine. *Id.* Notably:

> Silcotub  has  a  [
>
> *production process*

**CONFIDENTIAL**
**MATERIAL OMITTED**     NONCONFIDENTIAL

] At [

*production process*

] The [

]

Appx1030-1031; *see also* Appx1025. In other words, during the period of

review, hollows and subject tubing transferred back and forth between

Silcotub and Dalmine, demonstrating that, in essence, Dalmine and

Silcotub share facilities. *Id.* Additionally, Dalmine "purchased hollows

only from Silcotub and did not purchase hollows from any other

affiliated or unaffiliated supplier. Accordingly, the production of

{tubing} at the Costa Volpino mill is only performed using Dalmine self-

produced hollows or hollows purchased from Silcotub." Appx3321.

Third, Silcotub's selling expenses, including [

*expense information*

] were reported by Dalmine in

its indirect selling expenses. Appx3321-3322. Furthermore, for sales in

the U.S. market, Silcotub performed logistical services such as

maintaining inventory, arranging for freight from the mill to the port,

**CONFIDENTIAL MATERIAL OMITTED**    NONCONFIDENTIAL

delivery services, and arranging for repacking of merchandise, as needed. Appx3325. Silcotub also performed sales related administrative activities such as recording the sale in the system, issuing the invoice and other sales-related documentation, and processing the customer payment. *Id.* Dalmine reported that for "EP sales by Silcotub, the date of invoice refers to the date of Silcotub's invoice issued to [   *name*

    ] indicating that Silcotub issued invoices for the sale of subject tubing in the United States. Appx3328. Therefore, the selling expenses and selling functions of the two entities had already been collapsed. *Id.* The Department's decision ignored all of this evidence of intertwined operations without explanation and prevented the collapsing of production costs on the same merchandise.

Fourth, and critically, Petitioners explained that Dalmine acknowledged that from "an operational point of view, the Tenaris Groups companies, including Dalmine, Silcotub, TGS Uruguay, and TGS USA *act like an integrated company* using consolidated software, such as SAP, and procedures." Appx1035 (emphasis added). It is unclear how the Department could – without explanation –  treat entities that self-describe as "integrated" as not being intertwined.

NONCONFIDENTIAL

In its *Final Results*, the Department appears to have considered only two of four the elements listed under the third criteria for evaluating whether there is a significant potential for manipulation of price or production and ignored the rest of the evidence cited above. Appx1008. The Department acknowledged that there were indeed significant transactions between Dalmine and Silcotub, but it found no evidence of the sharing of facilities or employees between the two companies, despite the fact that Silcotub produces hot-finished hollows that feed Dalmine's cold finishing operations, thereby accounting for a significant percentage of Dalmine's overall cost structure. *Id.* Additionally, while the Department did acknowledge the fact that "Dalmine and Silcotub share significant sales information" at the outset of its analysis (Appx1007 n.34), it ignored this fact when evaluating the potential for manipulation of price or production (Appx1008). The Department also ignored whether operations are intertwined through involvement in production and pricing decisions, despite the extensive evidence Plaintiffs submitted regarding this factor. Ultimately, the Department conceded that "certain elements necessary for single entity treatment are present in this proceeding," but nevertheless concluded that the

NONCONFIDENTIAL

potential for manipulation of price does not exist for other reasons. Appx1008. That the Department ignored extensive and material evidence demonstrating that the affiliates' operations were intertwined warrants remand.

Furthermore, past agency practice demonstrates the Department has found this factor met under similar circumstances. In *Crystalline Silicon Photovoltaic Cells from China*, the Department collapsed a respondent with its affiliate because the "companies share sales information, coordinate in production and pricing decisions, share facilities and employees, and that there are significant transactions between them." Appx7728. Substantially similar facts exist here, where the record evidence demonstrates that Dalmine and Silcotub share sales information (as the Department itself acknowledged), coordinate in the production and sale of subject merchandise, share facilities, and share significant transactions between them. Appx1007, n.34. The Department also ignored its prior decision in *Copper Pipe and Tube from Vietnam*, in which it explained that the Department's regulations direct the agency "to consider whether operations are intertwined, such as through the sharing of sales information, involvement in production

NONCONFIDENTIAL

and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers." Appx7719. Instead, the Department limited its analysis under the third factor to only two of the four criteria and ignored Petitioners' arguments, and the underlying evidence, with respect to the remaining criteria.

As a result of the Department's decision not to collapse Dalmine and Silcotub as a single entity, the record is missing key data. Although neither the *Final Results* nor the *Remand Results* fully acknowledge the data collection shortcomings, the Department found that collapsing was not necessary because "Dalmine fully reported all production-related transactions with Silcotub, and these transactions are subject to the special rules for affiliated party costs." Appx1008. That is true of reporting for affiliated parties, however, collapsed parties are subject to a higher, more detailed standard of cost of production reporting. As Petitioners urged from the beginning of this review, the Department should have collected "all of Silcotub's costs and sales as a collapsed entity," including "the CONNUM-specific manufacturing costs for Silcotub's hollows," "Silcotub's production process for subject and non-subject merchandise," and "Silcotub's costs and sales reconciliations."

NONCONFIDENTIAL

Appx3240-3241.  The Department's failure to do so leaves a material gap in the record.

*     *     *

For these reasons, the Department's analysis of whether significant potential for manipulation of price or production exists with respect to Dalmine and Silcotub is inconsistent with agency practice and not supported by substantial evidence and must be remanded to the agency.

## Conclusion

For the reasons discussed above, Plaintiffs respectfully urge this Court to find that the Department's *Final Results* and *Remand Results* are not supported by substantial evidence and not otherwise in accordance with law. Plaintiffs urge this Court to remand the *Remand Results* to the Department with instructions to correct the errors set forth above.

Respectfully submitted,

/s/ Melissa M. Brewer
R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Plaintiffs

Dated: February 28, 2025

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Amended Scheduling Order dated February 14, 2025 (ECF No. 51), setting the word limitation to the Rule 56.2 Motion for Judgment on the Agency Record and accompanying Memorandum in Support of Plaintiffs ArcelorMittal Tubular Products, Michigan Seamless Tube, LLC, Webco Industries, Inc., and Zekelman Industries, Inc. to 14,000 words, counsel for Plaintiffs certifies that the attached Memorandum in Support of Rule 56.2 Motion for Judgment On the Agency Record contains <u>7,747 words</u>, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Enterprise – 365.

<u>/s/ Melissa M. Brewer</u>
R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400
aluberda@kelleydrye.com
mbrewer@kelleydrye.com

Counsel to Plaintiffs

Dated:  February 28, 2025