# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| ARCELORMITTAL TUBULAR PRODUCTS, *et al.*, | ) ) ) | **PUBLIC VERSION** Redacted at pages 3, 41 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 24-00039 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| DALMINE S.p.A., | ) ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

YAAKOV M. ROTH
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:

DANIELLE COSSEY
Attorney
Office of the Chief
Counsel for Trade Enforcement
  & Compliance
U.S. Department of Commerce


April 21, 2025

GEOFFREY M. LONG
Acting Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C.  20044
(202) 307-0159
Geoffrey.M.Long@usdoj.gov


Attorneys for the United States

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................iii

STATEMENT PURSUANT TO RULE 56.2 .............................................. 1

    I.    Administrative Determination Under Review ...................... 1

    II.   Issue Presented For Review .................................................. 2

STATEMENT OF FACTS ..................................................................... 2

    I.    Commerce's Administrative Review ...................................... 2

    II.   Commerce's Final Results .................................................... 5

    III.  Commerce's Remand Redetermination ................................ 9

SUMMARY OF THE ARGUMENT ......................................................... 15

ARGUMENT ........................................................................................ 17

    I.    Standard Of Review ........................................................... 17

    II.   Relevant Legal Framework ................................................ 17

    III.  Commerce's Treatment Of Silcotub And Dalmine
           As Separate Entities Is Supported By Substantial
           Evidence and In Accordance With Law ................................ 21

    IV.  Commerce Reasonably Determined That Silcotub
           Does Not Have The Ability To Manipulate The
           Price Or Production Of CDMT From Italy ........................... 34

          A.    Commerce's Determinations Regarding
                   Significant Potential For Manipulation Are
                   Supported By Substantial Evidence And
                   Are Lawful.................................................................. 35

          B.    Plaintiffs' Challenges To Commerce's
                   Manipulation Conclusions Cannot Succeed ............... 40

C.    Plaintiffs' Suggested "Higher, More-
Detailed" Cost-Reporting Standard Has No
Basis In Law................................................................. 44

CONCLUSION ........................................................................... 46

## CONFIDENTIAL MATERIAL REDACTED
## FROM THE NONCONFIDENTIAL RESPONSE BRIEF

Business proprietary information contained in brackets in the confidential response brief is redacted from this nonconfidential brief. This business proprietary information is subject to the protective order in the administrative proceeding before the U.S. Department of Commerce. The material redacted includes or is derived from business proprietary information that respondent Dalmine, S.p.A. submitted to Commerce, detailing Dalmine's customer relationships and organizational structure.
.

# TABLE OF AUTHORITIES

## Cases:

*Carpenter Tech. Corp. v. United States*,
   510 F.3d 1370 (Fed. Cir. 2007)............................................................18

*Catfish Farmers of Am. v. United States*,
   641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) ................................21, 42

*Coalition of Am. Millwork Producers v. United States*,
   581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) ..........................20, 35, 39

*Consolidated Edison Co. of N.Y. v. NLRB*,
   305 U.S. 197 (1938) ..............................................................................17

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ..............................................................................17

*Diamond Sawblades Manuf. Coal. v. United States*,
   37 C.I.T. 1501 (2013) ................................................................... passim

*Koenig & Bauer-Albert Ag v. United States*,
   90 F. Supp. 2d 1284 (Ct. Int'l Trade 2000) ........................................18

*Myland Indus., Ltd. v. United States*,
   31 C.I.T. 1696 (2007) ..........................................................................45

*NTN Bearing Corp. v. United States*,
   368 F.3d 1369 (Fed. Cir. 2004)............................................................39

*Queen's Flowers de Colom. v. United States*,
   981 F. Supp. 617 (Ct. Int'l Trade 1997) .......................................18, 32

*Slater Steels Corp. v. United States*,
   297 F. Supp. 2d 1362 (Ct. Int'l Trade 2003) .................................25, 27

*Ugine & ALZ Belg., N.V. v. United States*,
   517 F. Supp. 2d 1333 (Ct. Int'l Trade 2007) ......................................22

*United States Steel Corp. v. United States*,
   179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016) .....................18, 19, 20, 34

*Viraj Group v. United States,*
476 F.3d 1349 (Fed. Cir. 2007) ............................................................. 19

*Zhaoqing New Zhongya Aluminum Co. v. United States,*
70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015) .............................. 20, 35, 42

## **Statutes:**

19 U.S.C. § 1516a(b)(1)(B) ............................................................... 17

19 U.S.C. § 1677(16) .......................................................... 24, 26, 45

19 U.S.C. § 1677(25) .................................................................... 22

19 U.S.C. § 1677(28) .................................................................... 22

19 U.S.C. § 1677(29) .................................................................... 23

19 U.S.C. § 1677(3) ..................................................................... 24

19 U.S.C. § 1677(33)(A)-(G) ........................................................... 18

19 U.S.C. § 1677a ........................................................................ 37

19 U.S.C. § 1677b(a)(B)(i) ............................................................... 23

19 U.S.C. § 1677b(a)(B)(ii) .............................................................. 23

19 U.S.C. § 1677b(b)(3) .................................................................. 45

19 U.S.C. § 1677b(e)(1) .................................................................. 38

19 U.S.C. § 1677b(f)(2) .................................................................. 38

19 U.S.C. § 1677b(f)(3) ............................................................... 4, 38

19 U.S.C. § 1677j(b) ........................................................... 28, 31, 32

19 U.S.C. § 1677j(b)(1) ................................................................... 31

## Regulations:

19 C.F.R § 351.401(b) ................................................................ 38

19 C.F.R. § 351.226(d) ............................................................... 32

19 C.F.R. § 351.226(i) ........................................................... 28, 31

19 C.F.R. § 351.401(f) ....................................................... 18, 26, 38

19 C.F.R. § 351.401(f)(1) .................................................... passim

19 C.F.R. § 351.401(f)(2) .................................................... passim

19 C.F.R. § 351.401(f)(2)(ii) ..................................................... 40

19 C.F.R. § 351.407(b) ......................................................... 39, 44

## Other Authorities:

Statement of Administrative Action, H.R. Rep. No. 103-316 (1994),
  *reprinted at* 1994 U.S.C.C.A.N. 4040 ....................................... 42

## Federal Register Notices:

*Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg.
  27,296 (Dep't of Commerce May 19, 1997) ....................... 18, 20, 40, 43

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from
  Italy: Preliminary Results of the Antidumping Duty Review; 2021–
  2022*, 88 Fed. Reg. 43,281 (Dep't of Commerce July 7, 2023) ............... 4

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from
  the People's Republic of China, the Federal Republic of Germany,
  India, Italy, the Republic of Korea, and Switzerland: Antidumping
  Duty Orders; and Amended Final Determinations of Sales at Less
  Than Fair Value for the People's Republic of China and Switzerland*,
  83 Fed. Reg. 26,962 (Dep't of Commerce June 11, 2018) ..................... 2

in *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel
  From Italy: Final Results of Antidumping Duty Administrative*

*Review; 2021-2022*, 89 Fed. Reg. 1,523 (Dep't of Commerce Jan. 10, 2024) .................................................................................................. 2

*Indorama Chemicals (Thailand) Ltd. v. Int'l Trade Comm'n*, 26 C.I.T. 1059 (2003) ....................................................................................... 30

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 48,459 (Dept. of Commerce Aug. 9, 2022) ......... 3

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar from Italy*, 67 Fed. Reg. 3,155 (Dep't of Commerce Jan. 23, 2002) ....................................................................... 24

*Utility Scale Wind Towers From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 56,894 (Dep't of Commerce Oct. 13, 2021)................................................. 28, 29

Defendant, the United States, respectfully responds in opposition to the motion for judgment on the agency record filed by ArcelorMittal Tubular Products, Michigan Seamless Tube, LLC, Webco Industries, Inc., and Zekelman Industries, Inc. (plaintiffs), challenging the Department of Commerce's final results, and subsequent remand redetermination, of the 2021-2022 administrative review of the antidumping duty order on certain cold-drawn mechanical tubing of carbon and alloy steel (CDMT) from Italy.  Commerce's decision that Dalmine S.p.A. (Dalmine), a mandatory respondent, and its Romanian affiliate, S.C. Silcotub S.A. (Silcotub), are separate entities is supported by substantial evidence and otherwise in accordance with law.  The Court therefore should deny the motion and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

## I.    Administrative Determination Under Review

Plaintiffs challenge certain aspects of Commerce's fourth administrative review of the antidumping duty order on certain CDMT from Italy.  The period of review is June 1, 2021, through May 31, 2022.  Commerce's conclusions are set forth in *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From Italy: Final Results*

*of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 1,523 (Dep't of Commerce Jan. 10, 2024), Appx1012-1013, the accompanying issues and decision memorandum (IDM), Appx1000-1011, and Commerce's remand redetermination.  Appx7759-7769.

## II.    Issue Presented For Review

The issue presented for review is whether Commerce's determination not to treat Dalmine and Silcotub as a single entity, referred to as "collapsing," is unsupported by substantial evidence, or otherwise not in accordance with law.

## STATEMENT OF FACTS

## I.    Commerce's Administrative Review

In 2018, Commerce published the antidumping (AD) order on certain CDMT from Italy.  *See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the People's Republic of China, the Federal Republic of Germany, India, Italy, the Republic of Korea, and Switzerland: Antidumping Duty Orders; and Amended Final Determinations of Sales at Less Than Fair Value for the People's Republic of China and Switzerland*, 83 Fed. Reg. 26,962 (Dep't of Commerce June 11, 2018).  As described in the IDM here, the products covered by the order are "cold-drawn mechanical tubing of carbon and

**REDACTED**

alloy steel of circular cross-section, 304.8 mm or more in length, in actual outside diameters less than 331mm, and regardless of wall thickness, surface finish, end finish or industry specification." Appx1001.  "{T}he place of cold-drawing determines the country of origin of the subject merchandise."  Appx1002.

On August 9, 2022, Commerce initiated the fourth administrative review under the order.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 48,459 (Dept. of Commerce Aug. 9, 2022), Appx7236-7241.  Commerce selected Dalmine as a mandatory respondent and issued the initial questionnaire on August 26, 2022.  *See* Appx7257-7260.  In its initial questionnaire response, Dalmine reported that it produced subject merchandise during the period of review using hollows (*i.e.*, blank tubes for cold drawing) produced by both Dalmine and its Romanian affiliate, Silcotub.  *See* Appx1030.  Dalmine also reported U.S. sales directly from Italy and through Silcotub, in Romania, which cut the CDMT and then Description of customer relationships resold it to [                                    ].  *See* Appx1025.  Dalmine reported that Silcotub does not export Italian cold-drawn mechanical

tubing produced by any company other than Dalmine to the United States.  *See* Appx1032.

Commerce subsequently issued preliminary results.  *See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy: Preliminary Results of the Antidumping Duty Review; 2021–2022*, 88 Fed. Reg. 43,281 (Dep't of Commerce July 7, 2023), Appx7522-7524. Commerce also issued an accompanying preliminary decision memorandum (PDM).  Appx7503-7521.

Commerce preliminarily determined that Dalmine made sales of subject merchandise at prices below normal value during the period of review.  Appx7503.  Commerce treated Silcotub as an affiliate of Dalmine's and adjusted its reported costs according to the "major input rule" under 19 U.S.C. § 1677b(f)(3).  *See* Appx7517, Appx7519. Commerce preliminarily determined a weighted-average dumping margin of 2 percent for Dalmine.  Appx7522.

Petitioners in the proceeding subsequently requested that Commerce treat Dalmine and Silcotub as a single entity because, in the view of the domestic interested parties, (1) Dalmine and Silcotub are affiliated producers who have intertwined production facilities for

4

"identical merchandise," Appx7627; (2) Silcotub has the ability to produce identical merchandise through minor alternations to its facilities, Appx7630; and (3) there is significant potential for manipulation of price or production. Appx7630.[1] In rebuttal, Dalmine argued that Commerce followed its normal practice, as well as what was done in the three prior reviews, and that Commerce has discretion whether to apply the "major input rule to compare the {cost of production}, transfer price, and market price" to reflect the highest value for the major input, or to collapse parties. *See* Appx7612. Commerce verified Dalmine's reported home market and U.S. sales data in June and July 2023. *See* Appx1001.

## II.    **Commerce's Final Results**

On January 10, 2024, Commerce published its final results for the administrative review. *See* Appx1012-1013. Commerce continued to find that Dalmine and its affiliate Silcotub were separate entities. *See*

---

[1] As described below, the plaintiffs' original administrative brief was rejected for containing new factual information in the form of citations to certain collapsing memoranda that were not on the record. On voluntary remand, Commerce permitted the petitioners and Dalmine to resubmit their previously-rejected administrative case briefs and rebuttal briefs.

Appx1008. Commerce explained that pursuant to 19 C.F.R.

§ 351.401(f)(1), the agency treats producers as a single entity where:

> (1) those producers are affiliated; (2) the
> producers have production facilities for producing
> similar or identical products that would not
> require substantial retooling of either facility in
> order to restructure manufacturing priorities;
> and (3) there is a significant potential for
> manipulation of price or production.

Appx1006.

Further, Commerce applied 19 C.F.R. § 351.401(f)(2) to determine

whether a significant potential for manipulation exists, listing the

following factors for consideration:

> (1) the level of common ownership; (2) the extent
> to which managerial employees or board
> members of one firm sit on the board of directors
> of an affiliated firm; and (3) whether the
> operations of the affiliated firms are intertwined,
> such as through the sharing of sales information,
> involvement in production and pricing decisions,
> the sharing of facilities or employees, or
> significant transactions between the affiliated
> producers.

Appx1006.

In the IDM, Commerce noted that "no one factor is dispositive in

determining whether to collapse affiliated producers" and that the

regulatory framework is instructive for determining whether non-

producers should be collapsed as well as producers.  Appx1006.

Additionally, Commerce explained that, in instances where "non-

producing entities (*e.g.*, exporters) are affiliated with a producing entity,

Commerce evaluates whether there exists a significant potential for

manipulation of prices and/or export decisions in considering whether to

treat affiliated exporters and producers, such as Dalmine and Silcotub,

as a single entity."  Appx1008.

Commerce then considered and responded to parties' comments.

Commerce found as an initial matter that Silcotub is not a producer of

subject merchandise and does not have the ability to produce subject

merchandise through minor alterations to its facilities because "Silcotub

is located in Romania, and its production operations are based there."

Appx1007.  "Thus, Silcotub is unable to produce cold-drawn mechanical

tubing which is subject to the *Order* (*i.e.*, subject merchandise, which

has a country of origin of Italy); even if we were to treat Dalmine and

Silcotub as a single entity, any cold-drawn mechanical tubing produced

in Romania would not be subject to this proceeding."  Appx1007.

Commerce found that Dalmine and Silcotub are affiliated and that

"Silcotub both sells a major input necessary to the production of subject

merchandise to Dalmine and exports certain of the finished products to the United States." Appx1008. However, Commerce determined that "the potential for manipulation of price does not currently exist," for three reasons. Appx1008. First, Commerce pointed out that Silcotub does not export, to the United States, Italian CDMT produced by any company other than Dalmine. Second, Dalmine fully reported Silcotub's downstream sales of Dalmine's CDMT mechanical tubing in its U.S. sales database. Appx1008. Finally, Commerce explained that Silcotub does not have its own cash deposit rate and therefore there is no potential for the companies to export under the more advantageous of the two rates and, further, that Silcotub would have no incentive to export because "the all-others rate in this case significantly exceeds Dalmine's current company-specific cash deposit rate." Appx1008.

Commerce also determined that the potential for manipulation of production does not exist and reiterated its earlier point that Silcotub is located in Romania and cannot produce subject merchandise or foreign like product. Appx1008. Additionally, Commerce explained that Dalmine fully reported all production-related transactions with Silcotub, under the special rules for affiliated party costs. Appx1008.

Commerce also noted that there is "no evidence on the record that Dalmine and Silcotub have any overlap in management," and there is no evidence that they have common members on their boards of directors or share facilities or employees, which "further limit{s} their ability to manipulate the price or production of {CDMT}." Appx1007-1008.

Thus, Commerce concluded that there was no potential for manipulation of price or production and that the two affiliated entities should not be collapsed. Commerce continued to assign Dalmine a 2 percent weighted-average dumping margin. Appx1012.

## III. **Commerce's Remand Redetermination**

In their case brief submitted to Commerce, petitioners had cited certain other Commerce proceedings that petitioners asserted were germane to the collapsing issue. Leading up to the final results, Commerce rejected petitioners' case brief to the extent it cited and relied on information regarding other proceedings. *See* Appx7761. Commerce also rejected Dalmine's rebuttal case brief to the extent that brief referred to the other proceedings. *See* Appx7762

After petitioners filed suit in this Court, Commerce requested and was granted a remand to consider petitioners' and Dalmine's arguments regarding collapsing.  *See* Def. Mot. for Voluntary Remand at 9, ECF No. 40; Remand Order, ECF No. 41.  During the remand, at Commerce's request, petitioners and Dalmine then resubmitted their case briefs with citations to and discussions of the other proceedings, and petitioners submitted public versions of collapsing memoranda from those proceedings.

Seven collapsing memoranda were placed on the record, including the following:

- "Affiliation and Collapsing Memorandum for Grupo Simec," dated January 9, 2020 (*Rebar from Mexico, 2017-2018*), Appx7681-7687.

- "Affiliation and Collapsing Memorandum for Grupo Simec," dated December 5, 2016 (*Rebar from Mexico, 2014-2015*), Appx7688-7698.

- "Affiliation and Collapsing Memorandum for Grupo Simec," dated December 3, 2018 (*Rebar from Mexico, 2016-2017*), Appx7699-7708.

- "Less-Than-Fair-Value Investigation of Seamless Refined Copper Pipe and Tube from the Socialist Republic of Vietnam: Affiliation and Single Entity Treatment Memorandum," dated January 26, 2021 (*Copper Pipe and Tube from Vietnam*), Appx7710-7720.

- "Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, from the People's Republic of China: Affiliation and Collapsing Memorandum for Jinko Solar Import and Export Co., Ltd.," dated April 16, 2021 (*Solar Cells from China*), Appx7722-7729.

- "Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from the People's Republic of China: Final Affiliation and Collapsing Memorandum," dated December 22, 2021 (*Common Alloy from China*), Appx7731-7738.

- "Light-Walled Welded Rectangular Carbon Steel Tubing {(LWRT)} from Taiwan; Circumvention Inquiry – Preliminary Affiliation and Collapsing Memorandum," dated April 6, 2023 (*Carbon Steel Tubing from Taiwan*), Appx7740-7747.

- "Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Mexico: Preliminary Collapsing Memorandum for Deacero Group," dated November 30, 2022 (*Preliminary Rebar from Mexico 2020-2021*), Appx7749-7757.

Commerce issued its remand redetermination on December 19, 2024. Appx7759-7769. Commerce continued to find, after consideration of the additional collapsing memoranda, that "the record indicates . . . Dalmine and Silcotub are separate entities." Appx7768. Commerce considered the submitted collapsing memoranda as well as petitioners' resubmitted arguments that (1) Dalmine and Silcotub have production facilities for identical merchandise that would not require

11

substantial retooling to restructure their manufacturing priorities because both companies produce hollows that are used in the production of subject CDMT, and (2) Commerce's regulations expressly allow the collapsing of companies that have the capability to produce similar products.  *See* Appx7765.

To support these arguments regarding substantial retooling, plaintiffs cited *Carbon Steel Tubing from Taiwan* and *Solar Cells from China,* which are both cases in which Commerce found that "the entities at issue produced products which were within the scope of the orders/inquiry."  Appx7766.  Addressing these arguments from plaintiffs, Commerce explained that "it is impossible for Silcotub to produce subject merchandise at all, much less for it to produce such merchandise 'without substantial retooling,'" and therefore, "the consideration of these {two collapsing decisions} does not alter our determination not to collapse Dalmine and Silcotub."  Appx7766.  Additionally, Commerce noted that *Carbon Steel Tubing* was "made within the context of a circumvention inquiry."  Appx7766.  "Thus, Commerce found that the products produced in Vietnam were in-scope

merchandise only as a result of its finding that the LWRT completed in Vietnam was circumventing the {order}."  Appx7766.

Commerce also considered petitioners' arguments that there was significant potential for manipulation of price or production between Dalmine and Silcotub and that Commerce bases its determination on the totality of circumstances, as well as the associated citations to *Common Alloy from China*, *Copper Pipe from Vietnam*, and *Rebar from Mexico, 2017-2018*.  *See* Appx7767.  Commerce agreed that it makes decisions on this issue based on the totality of circumstances, and the agency continued to find that the totality of the circumstances in this review indicated that a significant potential for manipulation of price did not exist for the same reasons set forth in the IDM.  *See* Appx7767.[2]

---

[2] "{I}n this review, we find that the potential for manipulation of price does not currently exist because: (1) Silcotub does not export, to the United States, Italian cold-drawn mechanical tubing produced by any other company than Dalmine; (2) Dalmine has fully reported Silcotub's downstream sales of Dalmine's cold-drawn mechanical tubing in its U.S. sales database, as required by {19 U.S.C. § 1677a}; and (3) Silcotub does not have its own cash deposit rate (thereby creating the potential for the companies to export under the more advantageous of the two rates).  We also find that the potential for manipulation of production does not exist because: (1) Silcotub is located in Romania and cannot produce subject merchandise or foreign like product; and (2) Dalmine fully reported all production-related transactions with

In particular, Commerce noted that *Rebar from Mexico 2014-2015* did not support that Commerce's practice is to collapse entities based solely on overlapping ownership, because the totality of the circumstances in that case also demonstrated that the companies produced "substantially the same product and merchandise" and "record evidence demonstrate{d} a significant potential for manipulation of price and production . . . because of their high degree of affiliation and similar production facilities for rebar."  Appx7768 (quoting Appx7686). Because Commerce agreed that a collapsing decision is based on the totality of the circumstances, Commerce found that "none of the {collapsing} decisions compel{led} {it} to alter {its} determination in the *Final Results*."  Appx7768.

Thus, after considering the previously-rejected information, Commerce determined on remand that no changes to the final results

---

Silcotub, and these transactions are subject to the special rules for affiliated party costs.  Finally, as noted above, there is no evidence on the record that Dalmine and Silcotub have any overlap in management, nor is there any evidence that they have common members on their Boards of Directors or share facilities or employees, further limiting their ability to manipulate the price or production of cold-drawn mechanical tubing."  Appx7767 (quoting Appx1008).

were warranted, and that if the final results following redetermination
are affirmed by this Court, then Commerce will continue to treat
Dalmine and Silcotub as separate entities.  Appx7769.

## SUMMARY OF THE ARGUMENT

Commerce's treatment of Dalmine and Silcotub as separate
entities that are affiliated but not collapsed is supported by substantial
evidence and otherwise in accordance with the law.  Plaintiffs'
arguments to the contrary are unavailing.

Contrary to plaintiffs' argument, Commerce properly determined
that a producer outside of the country covered by the order is not a
"producer" of subject merchandise or foreign like product.  While
plaintiffs assert that Commerce's focus on the location of the producer
has no foundation in the regulation, Commerce's collapsing regulations
apply (1) to "producers" of subject merchandise (2) in "antidumping
proceeding{s}," with such proceedings involving subject merchandise
within the scope of a review from the same country.  Those
requirements are not met in this instance.  In particular, Commerce
explained that "Silcotub is unable to produce {CDMT} which is subject
to the Order (*i.e.*, subject merchandise which has a country of origin of

Italy)" and thus any CDMT produced in Romania would not be subject to this proceeding. Appx1007.

Plaintiffs' citations to prior collapsing memoranda do not undermine Commerce's determination in this case, as those memoranda involved different facts. For example, in *Carbon Steel Tubing*, the merchandise was out of scope because the third country was the country of origin; but Commerce found that the merchandise was circumventing the order and was brought into the scope as a result of a circumvention inquiry. This administrative review is not a circumvention inquiry, and the differing considerations between the two render such examples inapposite.

It is Commerce's practice to, where appropriate, collapse producers and non-producers, with regard to the considerations set forth at 19 C.F.R. § 351.401(f)(2), addressing significant potential for manipulation of price or production. But Commerce did not err in finding the absence significant potential. Silcotub's sales of Dalmine's subject merchandise and costs of production of the hollows input for subject merchandise were appropriately included in the margin

16

calculation and the totality of the circumstances weighed in favor of not collapsing.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consolidated Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

### II.    Relevant Legal Framework

Collapsing is a practice in antidumping proceedings by which Commerce "determines that affiliated companies should be regarded as one entity, and therefore calculates a single, weighted-average dumping margin to be assessed to the collapsed entity as a whole."  *See Koenig & Bauer-Albert Ag v. United States*, 90 F. Supp. 2d 1284, 1286 (Ct. Int'l

Trade 2000); *see also Carpenter Tech. Corp. v. United States*, 510 F.3d 1370, 1373 (Fed. Cir. 2007). The purpose behind this practice is "to ensure that {Commerce} reviews the entire producer or reseller, not merely a part of it." *Queen's Flowers de Colom. v. United States*, 981 F. Supp. 617, 622 (Ct. Int'l Trade 1997) (citation omitted); *see also United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1135 n.22 (Ct. Int'l Trade 2016) (explaining that "{c}ollapsing entities allows sales of one collapsed entity to be considered sales of the other for purposes of Commerce's dumping margin calculation").

Commerce's rules for collapsing affiliated producers are contained in 19 C.F.R. § 351.401(f). Three conditions must be satisfied for Commerce to collapse "two or more affiliated producers" into a "single entity." First, the companies must be affiliated," as defined by 19 U.S.C. § 1677(33)(A)-(G). There is no dispute that the parties are affiliated in this case, but collapsing "requires a finding of more than mere affiliation." *Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,345 (Dep't of Commerce May 19, 1997) (*Preamble*). Second, the affiliated producers must have "production facilities for similar or identical products that would not require

18

substantial retooling of either facility in order to restructure manufacturing priorities." 19 C.F.R. § 351.401(f)(1). This factor "requires similarity in the products produced, not in the facilities that produce them." *Viraj Group v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007). Third, there must be "a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1).

"Commerce {also} has developed a practice of collapsing exporters with affiliated producers of subject merchandise under certain circumstances." *United States Steel Corp.*, 179 F. Supp. 3d at 1135. "Commerce's practice for collapsing exporters with affiliated producers is to look solely at the second requirement under its regulation that the relationship between the affiliated companies raises 'a significant potential for manipulation of price or production.'" *Id.* (quoting Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Frozen and Canned Warmwater Shrimp From Brazil, at 14, (Dep't of Commerce Dec. 23, 2004), *available at* 2004 ITA Unpub LEXIS 104).

Commerce "may consider" the following factors in identifying a significant potential for the manipulation of price or production: (1)

"{t}he level of common ownership;" (2) "{t}he extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm;" and (3) "{w}hether operations are intertwined," for example, "through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers."  19 C.F.R. § 351.401(f)(2).  This list is "non-exhaustive."  *Preamble* at 27,346.  The decision whether to collapse entities is a "fact-specific inquiry" and therefore made on "a case-by-case determination."  *See Coalition of Am. Millwork Producers v. United States*, 581 F. Supp. 3d 1295, 1303 (Ct. Int'l Trade 2022) (citing *Preamble* at 27,345-46).

Moreover, "Commerce need not find all of the factors in the regulation present to find a significant potential for manipulation of price or production."  *United States Steel*, 179 F. Supp. 3d at 1139; *see also Preamble*, 62 Fed. Reg. at 27,346.  Instead, "{t}hese factors are considered by Commerce in light of the totality of the circumstances," meaning that "no one factor is dispositive in determining whether to collapse the producers."  *Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1304 (Ct. Int'l Trade 2015) (citation

20

omitted); *see also Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1373 (Ct. Int'l Trade 2009) (collapsing is "dependent upon the totality of the facts and circumstances").

## III. Commerce's Treatment Of Silcotub And Dalmine As Separate Entities Is Supported By Substantial Evidence and In Accordance With Law

Commerce's decision not to collapse Dalmine with its Romanian affiliate, Silcotub, is supported by substantial evidence and is in accordance with law. As an initial matter, Commerce disagreed with plaintiffs that "Silcotub is a producer of subject merchandise or that it has the ability to produce such merchandise through minor alterations to its facilities." *See* Appx1007. Because Silcotub is located in Romania, "Silcotub is unable to produce {CDMT} which is subject to the *Order* (*i.e.*, subject merchandise which has a country of origin of Italy)" and thus any CDMT produced in Romania would not be subject to this proceeding. *See* Appx1007. Accordingly, 19 C.F.R. § 351.401(f)(1) is not satisfied because Silcotub and Dalmine are not "affiliated producers" with production facilities for "similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." *See* 19 C.F.R. § 351.401(f)(1).

21

Plaintiffs argue that Commerce applied a "heightened standard" for collapsing because "{n}owhere in the regulation does it state that both affiliated parties must be located in the subject country or produce subject merchandise to be treated as a collapsed entity." *See* Pl. Br. at 22, ECF Nos. 52 (confidential version) & 54 (public version). This argument cannot succeed.

The collapsing regulations in effect at the time of the underlying review limit collapsing to "two or more affiliated *producers*." *See* 19 C.F.R. § 351.401(f)(1) (2021) (emphasis added). "Producer" is then defined by statute as "the producer of subject merchandise," meaning the "class or kind of merchandise that is within the scope." 19 U.S.C. §§ 1677(28), (25). And it is well-established that subject merchandise is determined by the product type as well as the country of origin. *See Ugine & ALZ Belg., N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (Ct. Int'l Trade 2007) (holding that "{f}or merchandise to be subject to the order, it must meet both parameters, *i.e.*, product type and country of origin," and "{c}onversely, if merchandise does not meet one of the parameters – either class or kind, or country of origin – it is outside the scope of the order"). Thus, a company that is not producing CDMT in

Italy – such as Silcotub – is not capable of producing subject merchandise and is not a "producer" within the meaning of 19 C.F.R. § 351.401(f)(1).

Moreover, Commerce's regulations specify that collapsing applies to "an antidumping proceeding." *See id.* The antidumping proceeding here involves CDMT from Italy. And in an antidumping proceeding, the dumping margin is the "amount by which the normal value exceeds the export price or constructed export price of the *subject merchandise*." 19 U.S.C. § 1677(29) (emphasis added). As stated above, subject merchandise is dependent on the country of origin. This is further affirmed by the definition of "normal value," which is "the price at which the *foreign like product* is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(B)(i).[3] The statute then provides multiple definitions of "foreign like product," all of which state

---

[3] Normal value may also be based on the price of the "*foreign like product*" in a third country, or the constructed export price based on the value of selling, general and administrative expenses incurred in connection with "the production and sale of a *foreign like product*." 19 U.S.C. § 1677b(a)(B)(ii) (emphasis added).

the "foreign like product" must be produced in the "same country"[4] as

the subject merchandise.  *See* 19 U.S.C. § 1677(16).   Accordingly,

collapsing a Romanian producer and an Italian producer is not

permitted under 19 C.F.R. § 351.401(f)(1).  *See Notice of Final*

*Determination of Sales at Less Than Fair Value: Stainless Steel Bar*

*from Italy*, 67 Fed. Reg. 3,155 (Dep't of Commerce Jan. 23, 2002), and

accompanying Issues and Decision Memorandum, at Comment 8,

*available at* 2002 ITA Unpub LEXIS 36 ("While the Department has

used the information from two companies to calculate a single weighted-

average margin for those companies when it determined collapsing was

appropriate, the Department has done so only within the confines of a

single proceeding, which involved a single country.").

    This Court has agreed and found that "{e}xcept for specific

enumerated exceptions to the rule, consolidating investigations and

---

[4]  The statute further makes it clear that the term "country" is singular in antidumping proceedings.  It is defined as a "foreign country, a political subdivision, dependent territory, or possession of a foreign country, and *except for the purpose of antidumping proceedings*, may include an association of {two} or more foreign countries, political subdivisions, dependent territories, or possessions of countries into a customs union outside the United States."  19 U.S.C. § 1677(3) (emphasis added).

data across country lines for antidumping duty investigations is

prohibited." S*later Steels Corp. v. United States*, 297 F. Supp. 2d 1362,

1364-65 (Ct. Int'l Trade 2003).  The Court in *Slater Steels* went on to

hold that,

> Congress intended to preclude collapsing data
> and conducting investigations across country
> lines in antidumping duty proceedings.
> Therefore, Commerce did not err in refusing to
> collapse the data of {two companies} across
> country lines.  Because the statute prohibits
> collapsing the data or the proceedings, Commerce
> was not unreasonable in its decision not to
> collapse the data even though there was a risk of
> price or production manipulation by the affiliated
> French and Italian companies.

*Id.*

In *Diamond Sawblades Manufacturers Coalition  v. United States*,

37 C.I.T. 1501 (2013), this Court further clarified that while "cross-

border analysis is required in certain instances," that "does not render

Commerce's broad interpretation of preclusion from 'collapsing'

'producers' across country lines unreasonable."  *Id.* at 1516.  By

declining here to collapse Dalmine with Silcotub, Commerce ensured

that only producers of subject merchandise were collapsed and that the

resulting dumping calculation was based on the production of

25

merchandise in the "same country" in accordance with 19 C.F.R.

§ 351.401(f) and 19 U.S.C. § 1677(16).

Plaintiffs assert that affiliates need not produce subject

merchandise to be collapsed.  *See* Pl. Br at 26.   But plaintiffs' reliance

on *Solar Cells from China* for the proposition that non-producing

entities may be collapsed is misplaced because it fails to consider a

critical distinction: the non-producing entity in that instance was

located in the country to which the order applied.  *See* Pl. Br. at 26

(citing Appx7726).  Plaintiffs conflate the inability to produce subject

merchandise because the production of such would be outside the scope

of the order – which is what Commerce reasoned here – with the

inability to produce because the company is an exporter – which is what

*Solar Cells from China* evaluated.  *See* Pl. Br. 26-27.

As to the question actually at hand, namely the collapsing of an

affiliate located in a different country, this Court explained in *Diamond*

*Sawblades* that "the threshold question in a collapsing inquiry is

whether the affiliate is a producer of the subject merchandise or the

foreign like product."  37 C.I.T. at 1512 (citing 19 C.F.R. § 351.401(f)(1)).

Like the plaintiff here, the plaintiff in *Diamond Sawblades* argued that

collapsing affiliates from a third country would be permissible under the antidumping statute and was warranted because "two of the respondent's affiliates provided inputs used in the production of the respondent's subject merchandise and 'the operations of all these entities were intertwined by significant arrangements between them.'" 37 C.I.T. at 1512. However, this Court rejected that argument and held that "the plaintiff's arguments were not persuasive that including affiliates from a third country would be permissible under the {antidumping} statute." *Id.* Accordingly, Commerce's determination here not to collapse Dalmine and Silcotub because Silcotub is a producer in Romania rather than Italy, and is therefore unable to produce subject merchandise, is reasonable and in accordance with law.

Plaintiffs also assert that Commerce has previously collapsed across borders when companies have the ability to produce similar or identical products. *See* Pl. Br. at 23. To be sure, there are "specific, enumerated exceptions" where Commerce will conduct cross-border analysis and even collapse a third-country company. *Slater Steels Corp.*, 297 F. Supp. 2d at 1364-65. In particular, Commerce's regulations allow collapsing affiliates across borders *in a circumvention*

*inquiry. See* 19 C.F.R. § 351.226(i) ("Under {19 U.S.C. § 1677j(b)}, the Secretary may include within the scope of an antidumping or countervailing duty order . . . imported merchandise completed or assembled in a foreign country other than the country to which the order applies.").

Critically, however, even in a circumvention inquiry, Commerce does not collapse an entity that does not produce subject merchandise. Rather, Commerce may collapse affiliates only where it determines that the completion or assembly of the product in the third country is found to be minor or insignificant so that the merchandise was still produced in the order country.

This point is illustrated by the very administrative cases that plaintiffs cite as examples of Commerce collapsing across borders. In *Utility Scale Wind Towers from Malaysia*, Commerce collapsed a Korean parent company with the Malaysian mandatory respondent. *See Utility Scale Wind Towers From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 56,894 (Dep't of Commerce Oct. 13, 2021), and accompanying IDM at Comment 1. Plaintiffs here argue that the "Korean entity . . . was not

engaged in the production of subject merchandise" in that case, yet

Commerce still collapsed the Korean company with the Malaysian

affiliate.  Pl. Br. at 23.  But Commerce never stated that the Korean

entity was not a producer of subject merchandise; to the contrary,

Commerce specifically identified the Korean company as a "producer of

subject merchandise" due to its tolling arrangement where it "controlled

and managed every aspect of the Malaysia company's sale and

production."  *Utility Scale Wind Towers from Malaysia* at Comment 1.

Commerce further noted that:

> {The Korean company's} role in the production
> and sale of merchandise under consideration goes
> beyond simply acting as the exporter; because it
> also directed and controlled the production of the
> merchandise sold to the United States during the
> {period of investigation}, it is also a producer of
> subject merchandise.  The petitioner
> acknowledges this fact when it characterizes {the
> Korean company} as a "producer-by-tolling."

*Utility Scale Wind Towers from Malaysia* at Comment 1.

In a tolling arrangement, "the tollee supplies raw material to the

toller, which produces the product for a fee" and "{u}sually, the tollee

pays to the toller only a fabrication fee and the price of the materials it

did not supply."  *See Indorama Chemicals (Thailand) Ltd. v. Int'l Trade*

*Comm'n*, 26 C.I.T. 1059, 1063 n.3 (2003).  Thus, in *Utility Scale Wind Towers from Malaysia*, Commerce collapsed an entity which, although based in Korea, controlled, through a tolling agreement, "every aspect" of the price and production in Malaysia to such a degree that it was, itself, considered the producer of the subject merchandise in the country of the order.

That determination only further illustrates that the third country company must produce subject merchandise in the same country as the order to be collapsed.  This is fundamentally different from the scenario whereby a third country company (*e.g.*, Silcotub) produces a non-subject product (*e.g.*, Romanian CDMT) *in a different country from the order* (*e.g.*, Romania).

Plaintiffs also cite *Carbon Steel Tubing from Taiwan* as an instance in which Commerce collapsed a third-country producer of merchandise.  Pl. Br. at 25 (citing Appx7744-7745).  However, as Commerce pointed out in its remand results here, that collapsing decision was made in the context of a circumvention inquiry, rather than an administrative review.  *See* Appx7765-7666.  Plaintiffs reject this distinction, arguing that "the type of proceeding does not impact

30

the applicability of the collapsing regulation, which applies with equal force." Pl. Br. at 25. While plaintiffs are correct that collapsing may apply in circumvention inquiries where the facts warrant it, this does not support their argument here. Plaintiffs overlook the entire point of a circumvention inquiry, which, as explained above, is that once the elements for circumvention are met, the merchandise at issue in the third country will be included within the scope of the order. *See* 19 U.S.C. § 1677j(b)(1); *see also* 19 C.F.R. § 351.226(i).

Indeed, the fact that Commerce's regulations explicitly provide for "imported merchandise completed or assembled in a foreign country other than the country to which the order applies" to be included in the scope of the order through a circumvention inquiry represents a specific enumerated exception to the general prohibition of collapsing across country lines. 19 C.F.R. § 351.226(i); *see also* 19 U.S.C. § 1677j(b) (authorizing Commerce to include in the scope of an order merchandise completed or assembled in other foreign countries, if certain statutory conditions are satisfied). When a circumvention inquiry is conducted and the completion or assembly of subject merchandise in a third country is found to be minor or insignificant, that specific producer is

31

considered to produce subject merchandise and may be collapsed with a company in the order country.

Indeed, a circumvention inquiry potentially provides a specific remedy for plaintiffs' concern about the alleged manipulation of cost reporting, as recognized in a case on which plaintiffs rely. As the Court pointed out in *Diamond Sawblades*, anti-circumvention proceedings and an additional antidumping order on the separate country provide protection from manipulation of production by a producer in a third country. *See* 37 C.I.T. at 1516.[5] But this is not a circumvention inquiry, which would require a specific analysis of whether the product was substantially transformed in the third country. *See* 19 U.S.C. § 1677j(b). Such inquiries must be unambiguously initiated. *See* 19 C.F.R. § 351.226(d).

_____

[5] Also, while plaintiffs cite to *Queen's Flowers de Colombia v. United States*, 981 F. Supp. 617 (Ct. Int'l Trade 1997)*,* for the proposition that collapsing prevents cost manipulation, in that case none of the producers or exporters were located in a third country and so the concern about cost manipulation was between producers who could all produce subject merchandise. *See id.* at 622 (noting that "{t}he 20 producers/exporters {in the administrative review of fresh cut flowers from Colombia} consist of . . . Colombian companies").

Plaintiffs are attempting to achieve the remedy of a second antidumping duty order (presumably on Romanian CDMT) or circumvention proceeding, by collapsing companies outside of the order country. However, plaintiffs neither alleged that the CDMT Silcotub produced was actually from Italy, nor did they request a circumvention inquiry and allege the further processing in Romania was minor, such that the finished product in Romania was actually produced in Italy.

In sum, collapsing in the context of a circumvention inquiry is distinct from collapsing producers across country lines and thus Commerce reasonably concluded here that *Carbon Steel Tubing from Taiwan* is not applicable. Appx7766.

Plaintiffs also assert that Commerce failed to consider certain confidential evidence on the record allegedly showing overlapping production facilities "for producing similar or identical products that would not require substantial retooling of either facility." *See* Pl. Br. at 29-30. This assertion, however, ignores Commerce's repeated explanation that "it is impossible for Silcotub to produce subject merchandise at all, much less for it to produce such merchandise 'without substantial retooling.'" Appx7766; *see* Appx1007; *see also*

33

*Diamond Sawblades*, 37 C.I.T. at 1512 (noting that "the threshold question in a collapsing inquiry is whether the affiliate is a producer of the subject merchandise or the foreign like product," and citing 19 C.F.R. § 351.401(f)(1)).

Commerce's determination not to collapse Dalmine and Silcotub because Silcotub does not – and cannot – produce subject merchandise, is in accordance with law and supported by substantial evidence.

## IV. Commerce Reasonably Determined That Silcotub Does Not Have The Ability To Manipulate The Price Or Production Of CDMT From Italy

As noted above, collapsing of producers, pursuant to 19 C.F.R. § 351.401(f)(1), also requires a significant potential for the manipulation of price or production of CDMT from Italy, as set forth in § 351.401(f)(2). Moreover, when determining whether to collapse an exporter with an affiliated producer, Commerce also looks to § 351.401(f)(2), as a non-exhaustive list. *See United States Steel Corp*, 179 F. Supp. 3d at 1136-1142; *see also* Pl. Br. at 21 (acknowledging that the list at § 351.401(f)(2) is non-exhaustive).

As explained above, the significant potential for manipulation of price or production is a fact-intensive inquiry that may consider the

level of common ownership, the overlap of managerial employees and board members, and whether operations are intertwined. *See* 19 C.F.R. § 351.401(f)(2); s*ee also Coalition of Am. Millwork Producers*, 581 F. Supp. 3d at 1303. Again, "{t}hese factors are considered by Commerce in light of the totality of the circumstances," meaning that "no one factor is dispositive in determining whether to collapse." *Zhaoqing New Zhongya Aluminum Co.*, 70 F. Supp. 3d at 1304 (citation omitted).

For the reasons set forth below, Commerce's determinations as to this inquiry are supported by substantial evidence, and independently warrant denial of plaintiffs' motion.

### A. Commerce's Determinations Regarding Significant Potential For Manipulation Are Supported By Substantial Evidence And Are Lawful

Commerce's determinations as to the existence of significant potential for the manipulation of price or production are supported by substantial evidence. As an initial matter in that analysis, Commerce acknowledged that "Dalmine and Silcotub are wholly owned by the same company, Tenaris S.A., and they have significant transactions between them related to the production and sale of Italian cold-drawn

mechanical tubing." Appx1007; *see* Appx1008 (recognizing that "certain elements necessary for single entity treatment are present in this proceeding, including the fact that Dalmine and Silcotub are affiliated, and that Silcotub both sells a major input necessary to the production of subject merchandise to Dalmine and exports"). However, Commerce found, "there is no evidence on the record that Dalmine and Silcotub have any overlap in management, nor is there evidence that they have common members on their Boards of Directors or share facilities or employees." Appx1007-1008.

Specifically regarding potential manipulation of price, Commerce furthermore found that there was no significant potential for manipulation because Silcotub does not export any CDMT to the United States by any other company than Dalmine. *See* Appx1008; *see also* Appx1032. In other words, because Silcotub has no other export prices of CDMT from Italy outside of Dalmine's – which have been included in Commerce's calculations – there are no additional export prices that would be accounted for in the export price calculation if Silcotub were collapsed. Commerce also found that Dalmine "has fully reported Silcotub's downstream sales" of CDMT in its database as required by

36

19 U.S.C. § 1677a.  Appx1008.  Finally, Commerce reasoned that "Silcotub does not have its own cash deposit rate" and therefore, there is no incentive or potential for Dalmine to export under the more advantageous of the rates.  Appx1008.  That point was further reinforced by the fact that the all-others rate which Silcotub would receive, if deemed subject to the order, "significantly exceeds Dalmine's current company-specific cash deposit rate."  Appx1008.  Therefore, even if Silcotub were found to produce subject merchandise and export it to the United States, the rate it would receive would be much higher than the rate Dalmine receives, so there is no incentive for Dalmine's production of subject merchandise to shift to Silcotub.  Thus, substantial evidence supports Commerce's determination that there is no potential for manipulation of price.

Commerce also reasonably found that there is no significant potential for manipulation of production.  *See* Appx1008.  As described above, Silcotub is located in Romania and therefore it cannot produce subject merchandise or foreign like product.  Appx1008.  Thus, if Dalmine were to manipulate production by moving its production to

Silcotub in Romania to evade the order, that production simply would no longer be covered by the order.[6]

Furthermore with respect to potential manipulation of production, Dalmine "fully reported all production-related transactions with Silcotub and these transactions are subject to the special rules for party costs." Appx1008. Those rules apply where Commerce does not collapse two affiliated parties under 19 C.F.R. § 351.401(f), and allow adjustments to prevent cost-shifting from distorting the calculation of normal value. Specifically, if Commerce determines that prices between affiliated parties are below market value, Commerce may use the "major input" rule to revise those prices. *See* 19 U.S.C. §§ 1677b(f)(2),(3); 19 C.F.R § 351.401(b). Application of this rule implicates a component in the calculation of constructed value, namely "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise." 19 U.S.C. § 1677b(e)(1). Such

---

[6] As previously discussed, where production is based in a third country, a petition for an additional antidumping order (in this instance, pertaining to Romania rather than Italy), or a request that Commerce initiate anticircumvention proceedings, would be the proper process.

costs may include inputs (either self-produced or purchased from third parties) that are consumed in the production of subject merchandise, such as the hollows input Dalmine purchased from Silcotub to produce subject merchandise. *See Coalition of Am. Millwork Producers*, 581 F. Supp. 3d at 1307. In calculating a dumping margin, the major input rule allows Commerce to use the higher price from among the cost of producing the input, the price at which it was transferred to the affiliate, or the market price. *See* 19 C.F.R. § 351.407(b); s*ee also Coalition of Am. Millwork Producers*, 581 F. Supp. 3d at 1307 (*citing NTN Bearing Corp. v. United States*, 368 F.3d 1369, 1374-75 (Fed. Cir. 2004)).

Commerce applied the major input rule here. Appx1004 (noting that Commerce "accepted Dalmine's reporting of its U.S. sales transactions, and . . . also adjusted its purchases of material inputs from Silcotub using the major input rule"). By doing so, Commerce adequately accounted for the manufacturing costs of Silcotub's input, adjusting such costs to the market price – which is higher than the production costs – because the parties are affiliated. *See* Appx1004.

**B.  Plaintiffs' Challenges To Commerce's Manipulation Conclusions Cannot Succeed**

Plaintiffs do not fully confront Commerce's findings regarding the totality of the circumstances on the issue of significant potential for manipulation of price or production.  Instead, they make a few narrow arguments, ignoring that the list of factors at 19 C.F.R. § 351.401(f)(2) is "non-exhaustive." *Preamble* at 27,346.  Ultimately, plaintiffs do not demonstrate a lack of substantial evidence or unlawfulness in Commerce's determination.

With respect to level of common ownership, plaintiffs assert that the "factor is met," Pl. Br. at 32, based on the fact that Dalmine and Silcotub are wholly owned by Tenaris S.A., and they have significant transactions between them related to the production and sale of Italian cold-drawn mechanical tubing.  *See* Pl. Br. at 31-32.  These facts were considered by Commerce.  *See* Appx1008.  But no given fact is of itself dispositive.  Instead, it is necessary to consider the totality of the circumstances.

With respect to "{t}he extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm," 19 C.F.R. § 351.401(f)(2)(ii), Commerce found that there is no

40

**REDACTED**

evidence of overlap in management or common members on their

Boards of Directors, nor evidence that there is sharing of facilities or

employees which further limits their ability to manipulate the price or

production of CDMT from Italy.  *See* Appx1007-1008.  To counter these

findings, plaintiffs assert that there is significant overlap in managerial

employees because [

Description of organizational structure

].  *See* Pl. Br. at

34.

      But that evidence merely shows that the [ Description of organizational

structure                                  ] not that the legal entity to which

Silcotub officials are assigned is Dalmine, or that the legal entity to

which Dalmine officials are assigned is Silcotub.  *See* Appx1073

Description of organizational structure

(demonstrating the [                    ] of Dalmine and Silcotub's parent

company).  Thus, the evidence on the record does not show that there is

managerial overlap between Silcotub and Dalmine, and Commerce's

statement that there is no evidence of overlap in management is

supported by substantial evidence.  *Cf.* Statement of Administrative

Action, H.R. Rep. No. 103-316 (1994), at 892, *reprinted at* 1994

U.S.C.C.A.N. 4040, 4216 ("Existing law does not require that an agency make an explicit response to every argument made by every party, but instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned." (internal citations omitted), *cited in Diamond Sawblades*, 37 C.I.T. at 1512 n.10.

Furthermore, even if this Court were to conclude that Commerce's finding of a lack of managerial overlap is unsupported, plaintiffs' citations to *Copper Pipe from Vietnam* and *Carbon Alloy from Korea*, Pl. Br. at 34, highlight that collapsing where some managerial overlap exists is *permitted*, not that it is *required*. Collapsing decisions are based on a totality of the circumstances, and therefore, any existence of managerial overlap would not alone render unreasonable Commerce's decision not to collapse. *See Zhaoqing New Zhongya Aluminum Co.*, 70 F. Supp. 3d at 1304; *see also Catfish Farmers of Am.*, 641 F. Supp. 2d at 1373. Plaintiffs themselves acknowledge that Commerce's analysis of this issue is based on a totality of the circumstances, Pl. Br. at 31, and that the list of factors at 19 C.F.R. § 351.401(f)(2) is "'non-exhaustive{,}' meaning the Department may consider other record

42

evidence relevant to its analysis." Pl. Br. at 21 (quoting *Preamble*, 62 Fed. Reg. at 27,345-46).

Finally, although plaintiffs assert that Commerce ignored certain record evidence concerning integrated operations, they admit that Commerce acknowledged that "certain elements necessary for single entity treatment are present in this proceeding." Appx1008. In particular, Commerce noted that Dalmine and Silcotub are affiliated, and that "Silcotub both sells a major input necessary to the production of subject merchandise to Dalmine and exports certain of the finished products to the United States." *See* Appx1008. This did not, however, overcome the many findings that ultimately weighed against collapsing. *See* Appx1008. Commerce considered evidence that detracted from its conclusions, but nonetheless reasonably found, based on a totality of the circumstances, that collapsing was not warranted for reasons explained above. *See* Appx1008-1009.

For the foregoing reasons, Commerce's treatment of Dalmine and Silcotub as separate entities that are affiliated but not collapsed is supported by substantial evidence and otherwise in accordance with the law.

43

### C.    Plaintiffs' Suggested "Higher, More-Detailed" Cost-Reporting Standard Has No Basis In Law

In their closing argument, plaintiffs asset that "collapsed parties are subject to a higher, more detailed standard of cost of production reporting." *See* Pl. Br. at 41.  But plaintiffs do not elaborate on this assertion, much less do they support it with any authority.

Moreover, the reporting that plaintiffs seek in fact is either already accounted for through the major input rule, or irrelevant to the calculation of normal value.  Specifically, plaintiffs contend that the allegedly required "higher, more detailed" reporting should include: (1) "the CONNUM-specific manufacturing costs for Silcotub's hollows" (2) "Silcotub's production process for subject and non-subject merchandise," and (3) "Silcotub's costs and sales reconciliations." *Id.*  Yet as previously discussed, Silcotub *did report* its manufacturing costs for the input, but because the parties were affiliates, Commerce used the price between market price, transfer price, and cost of production to calculate normal value in accordance with the major input rule.  *See* 19 C.F.R. § 351.407(b); Appx1004.  Thus, not only were the production costs accounted for, but Commerce calculated normal value using a higher price for the input than was reported in the production costs.

Plaintiffs also want the entities to be collapsed in order to require Silcotub to report its production process for subject and non-subject merchandise. Pl. Br. at 41. But as we have explained, Silcotub does not (and cannot) produce subject merchandise. Additionally, any production costs for non-subject merchandise would not be included in the dumping margin calculation, because normal value considers the costs of producing the "foreign like product" which is "merchandise . . . produced in the same country . . . as the subject merchandise." *See* 19 U.S.C. § 1677b(b)(3); *see also* 19 U.S.C. § 1677(16). Thus, Silcotub's production process for non-subject merchandise is completely irrelevant to the calculation of normal value.

Costs and sales reconciliations – the third category of information that plaintiffs seek through imposition of an unsupported "higher, more detailed" standard – ensure that "the respondent has accounted for all costs before allocating those costs to individual products." *See Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696, 1703 (2007). Here, however, Commerce relied on the market price rather than the cost of production, and so cost reconciliations are unnecessary.

45

Thus, in addition to being unsupported, the heightened reporting requirements sought by plaintiffs would only provide superfluous information on costs of producing non-subject merchandise that Commerce would not be permitted to use in the calculation of an antidumping duty rate for CDMT from Italy.

## **CONCLUSION**

For these reasons, we respectfully request that this Court deny plaintiffs' motion for judgment on the agency record.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/Geoffrey M. Long
GEOFFREY M. LONG

OF COUNSEL:

DANIELLE COSSEY
Attorney
Office of the Chief Counsel
  For Trade Enforcement &
  Compliance
Department of Commerce

Acting Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C.  20044
Tel:  (202) 307-0159
E-mail:  Geoffrey.M.Long@usdoj.gov

April 21, 2025

Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's Standard Chamber Procedures, and the Court's scheduling order (ECF No. 51) in that it contains 8,478 words, including text, footnotes, and headings.

/s/Geoffrey M. Long
GEOFFREY M. LONG

## **CERTIFICATE OF CONFIDENTIAL MATERIAL**

Pursuant to the Court's instructions for document formatting and ECF filing, I hereby certify that the foregoing brief contains 12 unique words marked confidential. This number is below the maximum permitted by Federal Circuit Rule 25.1(d)(1)(B).

/s/Geoffrey M. Long
GEOFFREY M. LONG