UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| ARCELORMITTAL TUBULAR PRODUCTS;<br>MICHIGAN SEAMLESS TUBE, LLC;<br>WEBCO INDUSTRIES, INC.; and<br>ZEKELMAN INDUSTRIES, INC.,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>  and<br><br>DALMINE S.p.A.,<br><br>    Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Court No. 24-00039<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NON-CONFIDENTIAL VERSION

DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD

       Gregory J. Spak
       Kristina Zissis
       Luca Bertazzo
       Matthew W. Solomon

       WHITE & CASE LLP
       701 Thirteenth Street, NW
       Washington, DC  20005
       (202) 626-3600

       *Counsel for Dalmine S.p.A.*

May 5, 2025

# Table of Contents

STATEMENT PURSUANT TO RULE 52.6 ............................................... 1

I.    Administrative Determination Under Review ................................ 1

II.   Issue Presented for Review ................................................ 2

STATEMENT OF FACTS ......................................................... 3

SUMMARY OF THE ARGUMENT ........................................... 14

ARGUMENT ........................................................................ 17

I.    Standard of Review ........................................................ 17

II.   Commerce Properly Applied Its Collapsing Regulation and Its
      Decision to Treat Dalmine and Silcotub as Separate Entities Is
      Supported by Substantial Evidence and in Accordance with Law 18

      A.    Legal Framework ................................................ 18

            1.    Collapsing .................................................. 18

            2.    The Major Input Rule .................................. 20

      B.    Commerce Properly Treated Dalmine and Silcotub as
            Separate Entities and Applied the Major Input Rule .......... 21

            1.    Commerce Properly Applied the Collapsing Regulation
                  .................................................................. 22

            2.    Commerce Correctly Determined That There Was No
                  Significant Potential for Manipulation of Price or
                  Production ................................................ 29

            3.    The Record Is Not Missing Data ................... 37

CONCLUSION ...................................................................... 39

## Table of Contents (Continued)

Pursuant to the Court's rules, and consistent with Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted on pages 6-8, 34, and 36. The material omitted on page 6 describes the cost of production ("COP") data reported in (f) of the major input chart; the material omitted on pages 7-8, and repeated on page 34, describes the transactions between Silcotub and Dalmine; and the material omitted on page 8, and repeated on pages 34 and 36, quantifies the portion of Dalmine hollows that Dalmine uses to produce cold-drawn mechanical tubing ("CDMT").

# Table of Authorities

## Cases

*Coalition of Am. Millwork Producers v. United States,*
  581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) ........................... 19, 24

*Consolidated Edison Co. v. NLRB,*
  305 U.S. 197 (1933) ................................................................ 17

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ............................................................ 17, 31

*Maquilacero S.A. de C.V. v. United States,*
  731 F. Supp.3d 1346, 1364 (Ct. Int'l Trade 2024) ...................... 19

*Matsushita Elec. Indus. Co. v. United States,*
  750 F.2d 927 (Fed. Cir. 1984) ........................................ 17, 18, 29

*Prosperity Tieh Enter. Co. Ltd. v. United States,*
  965 F.3d 1320, 1326 (Fed. Cir. 2020) .................................... 19, 20

*Slater Steels Corp. v. United States,*
  297 F. Supp. 2d 1362 (Ct. Int'l Trade 2003) ............................... 24

*Ugine & ALZ Belg., N.V. v. United States,*
  517 F. Supp. 2d 1333 (Ct. Int'l Trade 2007) ............................... 23

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951) ................................................................ 17

*Viraj Group v. United States,*
  576 F.3d 1349 (Fed. Cir. 2007) ................................................ 21

## Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................... 17

19 U.S.C. § 1677(25) ................................................................ 23

19 U.S.C. § 1677(28) ................................................................ 23

19 U.S.C. § 1677b(f)(3) ....................................................... 10, 20

19 C.F.R. § 351.104(a)(2)(i) ....................................................................... 11

19 C.F.R. § 351.401(f) ................................................................................ 18

19 C.F.R. § 351.401(f)(1)........................................................... 18, 22, 23

19 C.F.R. § 351.401(f)(2)........................................................................... 19

19 C.F.R. § 351.407(b) ............................................................................... 21

**Administrative Determinations**

*Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea:
Final Results and Final Determination of No Shipments of
Antidumping Duty Administrative Review; 2016-2018,*
84 Fed. Reg. 70,951 (Dep't Commerce Dec. 26, 2019),
and accompanying Issues and Decision Memorandum................33

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from
Italy:  Final Results of Antidumping Duty Administrative Review;
2021-2022,*
89 Fed. Reg. 1,523 (Dep't Commerce Jan. 10, 2024),
and accompanying Issues and Decision Memorandum......... passim

*Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from
Malaysia,*
86 Fed. Reg. 56,894 (Dep't Commerce Oct. 13, 2021), and
accompanying Issues and Decision Memorandum................. 25, 26

**Miscellaneous**

*Antidumping Duties; Countervailing Duties,*
62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ............. 19, 24

## Glossary of Acronyms and Abbreviations

| | |
|---|---|
| CDMT | Cold-Drawn Mechanical Tubing |
| CEP | Constructed Export Price |
| CONNUM | Control Number |
| COP | Cost of Production |
| DINDIRS1U | Indirect Selling Expenses Incurred by Dalmine for U.S. Sales |
| DINDIRS3U | Indirect Selling Expenses Incurred by Silcotub for U.S. Sales |
| DIRMAT | Direct Materials |
| DIRMAT_SILCO | Direct Materials for CONNUMs with Hollows Produced by Silcotub |
| EP | Export Price |
| EUR | Euro |
| IDM | Issues and Decision Memorandum |
| KG | Kilogram |
| NFI | New Factual Information |
| NME | Non-Market Economy |

On behalf of the Defendant-Intervenor in this action, Dalmine S.p.A. ("Defendant-Intervenor" or "Dalmine"), we hereby submit this response brief in opposition to the motion for judgment on the agency record filed by Plaintiffs ArcelorMittal Tubular Products, Michigan Seamless Tube, LLC, Webco Industries, Inc., and Zekelman Industries, Inc. ("Plaintiffs" or "Petitioners") on February 28, 2025, ECF No. 52 (confidential version) & 54 (public version) ("Pls. Br."). Defendant United States ("Defendant") filed its response to Plaintiffs' motion for judgment on the agency record on April 21, 2025, ECF No. 58 (confidential version) & ECF No. 59 (public version) ("Def. Br."). For the reasons discussed below, and in Defendant's response brief, Defendant-Intervenor respectfully requests that this Court deny Plaintiffs' motion because the determination that they challenge is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 52.6

## I.    Administrative Determination Under Review

Plaintiffs challenge certain aspects of the final results and remand results issued by the U.S. Department of Commerce ("the Department" or "Commerce") in the fourth administrative review of the antidumping duty ("AD") order on *Certain Cold-drawn Mechanical Tubing of Carbon*

*and Alloy Steel from Italy* ("*CDMT from Italy*"). *See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 1,523 (Dep't Commerce Jan. 10, 2024) ("*Final Results*") (Appx1012-1013) and the accompanying *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy; 2021-2022* (Dep't Commerce Jan. 3, 2024) ("*IDM*") (Appx1000-1011); Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce Dec. 19, 2024), ECF No. 44 ("*Remand Results*") (Appx7759-7769).

## II.    Issue Presented for Review

Whether Commerce's decision to treat Italian mandatory respondent Dalmine and its Romanian affiliate S.C. Silcotub ("Silcotub") as two separate entities rather than as a single collapsed entity is unsupported by substantial evidence, or otherwise not in accordance with law?

No. Commerce properly treated Dalmine and Silcotub as two separate entities rather than as a single collapsed entity, and its

decision is supported by substantial evidence and otherwise in accordance with law.

**STATEMENT OF FACTS**

Commerce initiated the fourth administrative review of the AD order on *CDMT from Italy* on August 9, 2022. Appx7236-7241. It selected Dalmine, an Italian producer of *CDMT from Italy*, as the sole mandatory respondent and issued the initial questionnaire on August 26, 2022. Appx7257-7439.

Dalmine submitted its Section A response on September 16, 2022. Appx1016-2198. Dalmine explained that Silcotub is a Romanian producer of seamless steel pipe products, and that it is affiliated with Dalmine due to ownership by a common parent, Tenaris S.A. Appx1443, Appx1073. Dalmine described the role of Silcotub in the production and sale of *CDMT from Italy* during the fourth review. With respect to production, "Silcotub produced hollows at its plant in Zalau, Romania and sold them to Dalmine to produce CDMT in Italy." Appx1030. With respect to sales, a portion of CDMT produced by Dalmine in Italy was shipped from Italy to the United States, and, as in the prior three reviews, a portion also was sold to Silcotub in Romania, cut by Silcotub

in Romania, and shipped from Romania to the United States. Appx1025, Appx1028. Because the cutting performed in Romania did not change the country of origin, the CDMT remained subject to the order on CDMT from Italy and would be reported on Dalmine's U.S. sales database. Appx1028. U.S. sales by Dalmine and by Silcotub included (1) export price ("EP") sales invoiced to the unaffiliated U.S. customer, and (2) constructed export price ("CEP") sales imported by the affiliated U.S. company Tenaris Global Services (U.S.A.) Corporation ("TGS USA") and resold by TGS USA to unaffiliated U.S. customers. Appx1024-1025, Appx1039-1040.

Dalmine submitted its Section C response and U.S. sales database on October 11, 2022. Appx2474-2932. On the database, Dalmine reported CEP sales of CDMT made by TGS USA to unaffiliated U.S. customers that were produced by Dalmine and sold to TGS USA by both Dalmine and Silcotub. Appx2488. The CEP sales were reconciled to TGS USA's audited financial statements in a U.S. sales reconciliation in Exhibit C2. Appx2590-2595. Dalmine also reported EP sales of CDMT made by Dalmine and Silcotub to the unaffiliated U.S. customer of CDMT produced by Dalmine. Appx2489. Silcotub's EP sales were reconciled to

Silcotub's audited financial statements in a separate EP sales reconciliation in Exhibit C2. Appx2489, Appx2596-2598.

Dalmine submitted its Section D response and cost database on October 24, 2022. Appx2933-3236. Dalmine explained that Dalmine produces CDMT using hollows produced by Dalmine and by Silcotub. Appx2951. Dalmine demonstrated that the hollows are a major input and that, for hollows purchased from Silcotub, Dalmine reported on the cost database Silcotub's standard cost for the hollows in the appropriate direct materials ("DIRMAT") field: "consistent with Dalmine's normal books and record, the DIRMAT reported in field DIRMAT_SILCO for CONNUMs with hollows produced by Silcotub represents the standard cost of the hollows produced by Silcotub *plus* the movement expenses from Silcotub to Dalmine." Appx2951. Dalmine explained that this cost was reported on the database on a product-specific (*i.e.*, by control number ("CONNUM")) per-unit basis: "In field DIRMAT_SILCO, Dalmine reports the CONNUM specific per-unit direct material cost incurred in EUR/KG to produce the MUC with Silcotub hollows." Appx2994. The printout of sample sales from the cost database in

5

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Exhibit D1 shows the reporting of costs in field DIRMAT_SILC●_ACT.
Appx3000-3017.

Dalmine also completed Commerce's major input chart for hollows
from Silcotub, which requires reporting one number for the average
market price ("(d)"), one number for the average transfer price ("(e)"),
and one number for the cost of production ("C●P") ("(f)"). Appx2954-
2956. The support for the market price and transfer price reported in
the chart was provided in Exhibit D5. Appx3029-3058. The C●P in (f)
was the [Description] of the product specific per-unit cost of production
incurred by Silcotub from the cost database. Appx2954, Appx2956.

Dalmine also explained that it reported in field DIRMAT_SILC●
Silcotub's standard cost, and that this approach is "consistent with
Dalmine's normal books and records." Apps2953, Appx2994.
Accordingly, the costs for Silcotub's hollows are reflected in the cost
reconciliation Dalmine provided in Exhibit D12. Appx3092.

In addition, Dalmine explained that it reported the cutting costs
incurred by Silcotub in Romania for U.S. sales of CDMT from Italy by
Silcotub in field CTLC●ST on the cost database, consistent with
Commerce's instructions in prior reviews, and provided a sample cost

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

build up in Exhibit D19 for the largest product that was cut at Silcotub. Appx2940, Appx3222-3226.

●n January 9, 2023, Petitioners filed a letter regarding Dalmine's initial Sections A-D responses asking Commerce for the first time in any review to collapse Dalmine and Silcotub and to request that Dalmine report C●NNUM-specific manufacturing costs for Silcotub's hollows, report Silcotub's production process for subject and non-subject merchandise, and report Silcotub's costs and sales reconciliations. Appx3240-3241. Ignoring that Dalmine reported C●NNUM-specific costs, the letter incorrectly claimed that Dalmine reported on the cost database the single cost that is inserted in (f) of the major input chart. Appx3240.

Commerce issued a supplemental Section A and B questionnaire on February 21, 2023, with follow up questions regarding Silcotub. Appx3263-3265. Dalmine provided complete responses on March 10, 2023. Appx3317-3328. In response to Commerce's supplemental Section A questionnaire, Dalmine confirmed that "the subject CDMT sent to Silcotub for cutting was not produced [ Description of transactions between Dalmine and Silcotub ]." Appx3321. It also confirmed that "Dalmine and Silcotub

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

structure the [ Description of transactions between Dalmine and Silcotub

].” Appx3321.

Commerce issued a supplemental Section C questionnaire on March 15, 2023, with follow up questions regarding Silcotub. Appx3505-3506. Dalmine provided complete responses on March 24, 2023. Appx3517-3524, Appx3528. Commerce issued a supplemental Section D questionnaire on March 29, 2022, with follow up questions regarding Silcotub, including about the reported direct material costs for hollows produced by Dalmine and hollows from Silcotub. Appx3647-3648. Dalmine responded on April 14, 2023, explaining that the [ Quantification of portion ] of hollows are sourced from Dalmine rather than from Silcotub, the reasons Dalmine purchases some hollows from Silcotub, and the activities performed at Dalmine to produce CDMT from Silcotub hollows. Appx3659-3661.

On June 6, 2023, Commerce issued a second supplemental Section D questionnaire requesting that, in addition to the CONNUM-specific COP Dalmine had reported on the cost database for hollows, Dalmine also report the transfer price for hollows purchased from Silcotub and

confirm the components of the COP of hollows purchased from Silcotub in the major input chart. Appx3898. Dalmine provided the requested reporting on June 15, 2023, and narrative responses, and also revised (f) in the major input chart to include, in addition to the COP from the cost database, separate amounts for selling, general, and administrative ("SG&A") and financing expenses. Appx3986-3992.

On June 8-9, 2023, Commerce conducted a U.S. sales verification in Houston, Texas. Appx5158-5170.

Petitioners filed comments before the *Preliminary Results* requesting that Commerce collapse Dalmine and Silcotub and that Commerce issue a questionnaire to Dalmine "instructing it to report Silcotub's cost of production for the hollows transferred to Dalmine." Appx6882-6896. They repeated their request that Commerce instruct Dalmine to "fully report" the COP for hollows rather than what they incorrectly claimed is the cost in (f) of the major input chart. Appx6897-6898. Their comments reflect that Petitioners, as in their earlier comments, again failed to understand that Dalmine had fully reported the CONNUM-specific COP for the hollows from Silcotub on its cost database.

On June 30, 2023, Commerce issued its *Preliminary Results*, and did not collapse Dalmine and Silcotub. Appx5171-5629. In accordance with 19 U.S.C. § 1677b(f)(3), and its approach in the prior three reviews, Commerce applied the major input rule to analyze purchases from Silcotub by comparing the COP, the transfer price, and the market price, and determined that the market price exceeded both the transfer price and the cost. Appx5173-5174. Consequently, Commerce increased the reported transfer price to reflect the market price by applying an adjustment. Appx5173-5174, Appx5181.

On July 24-28, 2023, Commerce conducted a sales verification in Dalmine, Italy. Appx6783-6797. Three officials from Silcotub responsible for Silcotub's reported information (Economic and Financial Planning Manager, Cost Manager, and Controller) traveled from Romania to Italy to verify the information provided by Silcotub, and Commerce identified no discrepancies. Appx6791-6792, 6794-6797.

Petitioners filed a case brief on September 25, 2023, and Dalmine filed a rebuttal brief on October 2, 2023. Commerce requested refiling of Petitioners' case brief to remove references to the collapsing memoranda from other cases that were not on the record in this review

and therefore constituted impermissible new factual information ("NFI") that could not be considered in accordance with 19 C.F.R. § 351.302(d)(1)(i) and 19 C.F.R. § 351.104(a)(2)(i). Appx7559-7561. Commerce also requested refiling of the comments filed before the *Preliminary Results* by Petitioners to remove references to the collapsing decisions. Appx7559-7561. Commerce requested that Dalmine refile its rebuttal brief to remove responses to arguments that had to be removed by Petitioners. Appx7576-7577.

In their case brief, Petitioners argued that Commerce should collapse Dalmine and Silcotub. Appx6906-6922. Petitioners requested that Commerce "should instruct Dalmine to revise its cost database to enable the Department to collapse Dalmine and Silcotub's cost of production" and "collect the requisite cost information from Dalmine," citing to their prior comments. Appx6920. In its rebuttal brief, Dalmine argued that Commerce should reject Petitioners' request for collapsing and that Commerce properly exercised its discretion to apply the major input rule consistent with the prior three reviews. Appx6940-6946. Dalmine also argued that Petitioners' request to have Commerce reopen the record to request cost data for the major input (*i.e.*, hollows) that

Dalmine purchased from Silcotub "serves no purpose because Dalmine already reported Silcotub's COP for the hollows, as well as the transfer price for the hollows, on its cost database." Appx6940.

Petitioners participated in a teleconference on December 20, 2023, with Commerce to request reconsideration of Commerce's rejection of their submissions. Appx7579.

On January 3, 2024, Commerce issued its *Final Results*. Appx1000-1013. In its *IDM*, Commerce relied on the "totality of the circumstances" to determine that collapsing Dalmine and Silcotub was not necessary. App1008. Based on "the facts on this specific record," Commerce determined that "the potential for manipulation of price does not currently exist" because Silcotub only exported CDMT from Italy produced by Dalmine, Dalmine reported all of Silcotub's downstream sales to the United States, and Silcotub does not have its own cash deposit rate that would create an incentive to export under the more advantageous of two rates. App1008. Commerce also determined that the "potential for manipulation of production does not exist" because Silcotub is in Romania and cannot produce CDMT *from Italy* and "Dalmine fully reported all production-related transactions with

12

Silcotub," which "are subject to the special rules for affiliated party costs." App1008.

Plaintiffs filed this appeal of the *Final Results*, ECF No. 1. In its Complaint, Plaintiffs challenged in Count I Commerce's treatment of the collapsing memoranda as NFI, and in Count II Commerce's failure to consider the agency precedent in the memoranda alleging that Commerce's decision not to collapse "conflicts with" the precedent "with similar facts." *See* Compl. at 7, 10, ECF No. 8. On September 26, 2024, Defendant filed a motion requesting that the Court grant a voluntary remand, ECF No. 40. The Court granted Defendant's motion on September 27, 2024, ECF No. 41.

During the remand proceeding, Commerce "exercised its discretion" to permit Petitioners to submit public versions of the collapsing memoranda, even though they constituted NFI, and to permit Petitioners to refile the original versions of their case brief and their comments before the *Preliminary Results* containing discussion of the NFI. Appx7669-7670, Appx7763. Commerce also requested that Dalmine refile its original rebuttal brief that responded to Petitioners' arguments regarding the NFI. Appx7670. Petitioners refiled the

13

comments (Appx7623-7643) and case brief (Appx 7645-7668), and they submitted the memoranda (Appx 7671-7758). Dalmine refiled its rebuttal brief. Appx7598-7618.

Commerce issued its *Remand Results* on December 19, 2024. Appx7759-7769. Commerce rejected Petitioners' reliance on the collapsing decisions as "misplaced," stated that it already "addressed each of the arguments regarding significant potential for manipulation raised by the petitioners in the *Final Results*," and emphasized "Commerce considers the totality of circumstances and facts presented in each segment of a proceeding to determine whether to collapse entities." Appx7767-7768. Commerce concluded: "{A}fter reconsideration and allowing the parties to submit NFI and associated arguments, Commerce continues to find that the record indicates that Dalmine and Silcotub are separate entities." Appx7768.

## SUMMARY OF THE ARGUMENT

In the *Final Results*, Commerce correctly determined that Dalmine and Silcotub should be treated as separate entities. Commerce properly applied its collapsing regulation and considered the "totality of the circumstances" and facts on the record of the fourth review to conclude

that there was no significant potential for manipulation of price or production.

In this appeal, Commerce requested a voluntary remand to grant Plaintiffs' request to submit Commerce collapsing memoranda from past cases they had not submitted on the fourth review record that they claimed supported their collapsing argument. In allowing the submission of the memoranda, Commerce made an exception to its practice and regulations, which do not permit submission of untimely NFI. In its *Remand Results*, Commerce considered and appropriately rejected Plaintiffs' arguments regarding the relevance of these past Commerce collapsing decisions and properly continued to treat Dalmine and Silcotub as separate entities based on the record evidence.

Plaintiffs' argument lacks any merit and should be rejected by this Court. Their assertion that Commerce misapplied its collapsing regulation and should have collapsed Dalmine and Silcotub based on past collapsing cases is contrary to the decisions of Commerce and this Court that collapsing decisions are fact-intensive inquiries to be made on a case-by-case basis.

Moreover, Commerce's voluntary remand, which permitted the submission of the collapsing memoranda followed by the consideration of Petitioners' arguments based on the memoranda, has provided all the relief Petitioners sought in their Complaint that is appropriate in this appeal. A remand to grant the additional remedy they proposed below and continue to propose in their initial brief – that Commerce seek CONNUM-specific COP information from Dalmine for hollows from Silcotub – serves no purpose for several reasons. First, as it repeatedly has explained, Dalmine already reported this information on its cost database. In addition, Commerce did not use the reported Silcotub COP to value the hollows because, consistent with the prior three reviews, Commerce exercised its discretion to apply the major input rule to identify the highest of the COP, transfer price, and market price and made an appropriate adjustment to the reported transfer price to reflect the market price.

For the reasons discussed in this brief, and those presented by Defendant, Dalmine respectfully requests that this Court reject Plaintiffs' arguments and affirm Commerce's decision in the *Final*

*Results* and *Remand Results* to treat Dalmine and Silcotub as separate entities.

**ARGUMENT**

**I.    Standard of Review**

In reviewing a challenge to Commerce's determination in an AD proceeding, the Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i).

A decision is supported by substantial evidence where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1933); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Moreover, a plaintiff

17

cannot ask the Court to reweigh the evidence on the record and decide the case for Commerce. *See Matsushita*, 750 F.2d at 933.

## II. Commerce Properly Applied Its Collapsing Regulation and Its Decision to Treat Dalmine and Silcotub as Separate Entities Is Supported by Substantial Evidence and in Accordance with Law

Commerce's determination to treat Dalmine and Silcotub as separate entities is supported by substantial evidence and otherwise in accordance with law. Moreover, Commerce's decision to apply the major input rule to value the hollows purchased by Dalmine from Silcotub was consistent with its practice and its approach in all three prior reviews.

### A. Legal Framework

#### 1. Collapsing

Commerce's rules for collapsing affiliated producers are set out in its regulations. 19 C.F.R. § 351.401(f). The collapsing provision states that Commerce will treat "affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and {Commerce} concludes that there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1). In assessing whether a

significant potential for manipulation exists, Commerce "may consider" various factors, including (1) "{t}he level of common ownership;" (2) "{t}he extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm;" and (3) "{w}hether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers." 19 C.F.R. § 351.401(f)(2).

Commerce has stated that collapsing determinations "are very much fact-specific in nature, requiring a case-by-case analysis{.}" *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,346 (Dep't Commerce May 19, 1997) ("*Final Rule*"); *see also Coalition of Am. Millwork Producers v. United States*, 581 F. Supp. 3d 1295, 1303 (Ct. Int'l Trade 2022) ("The decision whether to collapse entities is a fact-specific inquiry and therefore a case-by-case determination"). This Court and the Federal Circuit have recognized that Commerce must consider the "totality of the circumstances" in assessing whether there is significant potential for manipulation of price or production. *See Maquilacero S.A. de C.V. v. United States*, 731 F. Supp.3d 1346, 1364

(Ct. Int'l Trade 2024) (citing *Prosperity Tieh Enter. Co. Ltd. v. United States*, 965 F.3d 1320, 1326 (Fed. Cir. 2020) ("For a collapsing analysis, 'Commerce must consider the 'totality of circumstances' between all entities when it evaluates whether, for purposes of collapsing entities, there is significant potential for manipulation of price or production to circumvent antidumping duties")). The Federal Circuit has stated that "{t}he purpose of collapsing multiple entities into a single entity is to prevent affiliated entities from circumventing antidumping duties by 'channel{ing} production of subject merchandise through the affiliate with the lowest potential dumping margin." *Prosperity Tieh*, 965 F.3d at 1323 (citation omitted).

### 2.   The Major Input Rule

The "major input rule" authorizes Commerce to determine the basis for the value of the major input in transactions between affiliated parties involving a major input to the subject merchandise. 19 U.S.C. § 1677b(f)(3). Commerce's regulations provide that Commerce "normally will determine the value of a major input purchased from an affiliated person based on the higher of": (1) the affiliated party's transfer price;

(2) the market price; or (3) the cost to the affiliated person of producing the major input. 19 C.F.R. § 351.407(b).

The Federal Circuit has recognized that Commerce has discretion to collapse affiliated parties or to apply the major input rule. *See Viraj Group v. United States*, 576 F.3d 1349, 1357-58 (Fed. Cir. 2007) (holding that Commerce has discretion to decide whether to apply the major input rule and that "Commerce's practice, to either treat affiliated companies as one or to consider transactions among companies under the fair value and major input rules, is reasonable").

### B. Commerce Properly Treated Dalmine and Silcotub as Separate Entities and Applied the Major Input Rule

In the *Final Results* and *Remand Results*, Commerce followed its practice in the first through third reviews with respect to its treatment of cost and sales transactions between Dalmine and Silcotub. Appx7612.

On the production side, for the major input that Dalmine purchased from Silcotub to make a portion of the CDMT produced by Dalmine, Commerce applied the major input rule and made an adjustment to value the input at the market price because it was the highest of the COP, transfer price, or market price. Appx5173-5174. Commerce also used the reported costs for cutting CDMT at Silcotub. Appx5173. On the

sales side, Commerce used the verified, reported sales by Dalmine and Silcotub of CDMT produced by Dalmine and the expenses and adjustments for these sales to calculate one weighted-average margin for CDMT produced by Dalmine that serves as the cash deposit rate of 2.00 percent for all entries into the United States regardless of whether they were sold by Dalmine or Silcotub. Appx5171.

In the *Final Results* and *Remand Results*, Commerce properly treated Dalmine and Silcotub as separate entities because it considered the "totality of the circumstances" and determined that the potential for manipulation of price or production does not exist based on the facts of this specific record in the fourth review. Appx1008, Appx7768.

### 1. Commerce Properly Applied the Collapsing Regulation

Plaintiffs erroneously claim that Commerce has applied the wrong standard, pointing to past Commerce cases with different facts, and asserting without basis that Commerce ignored facts when evaluating whether Dalmine and Silcotub "have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities {…}." Pls. Br. at 21-31 (citing 19 C.F.R. § 351.401(f)(1)).

Commerce properly concluded that "Silcotub is located in Romania; thus it is impossible for Silcotub to produce subject merchandise at all, much less for it to produce such merchandise 'without substantial retooling.'" Appx7766, Appx1007. Therefore, Commerce stated that, even if it "were to treat Dalmine and Silcotub as a single entity, any cold-drawn mechanical tubing produced in Romania would not be subject to this proceeding." Appx1007.

Plaintiffs claim that Commerce "impos{ed} a heightened standard for collapsing," asserting that "{n}owhere in the regulation does it state that both affiliated parties must be located in the subject country or produce subject merchandise to be treated as a collapsed entity {…}." Pls. Br. at 22. They ignore Commerce's regulations in place at the time of the fourth review, which address the treatment of "affiliated producers." 19 C.F.R. § 351.401(f)(1) (2021). "Producer" is defined as "the producer of the subject merchandise," and "subject merchandise" is defined as "the class or kind of merchandise that is within the scope." 19 U.S.C. § 1677(28), (25). Subject merchandise also is determined both by "product type" and "country of origin." *See Ugine & ALZ Belg., N.V. v. United States*, 517 F. Supp. 2d 1333, 1345 (Ct. Int'l Trade 2007). This

Court has held that, "Except for specific enumerated exceptions to the rule … Congress intended to preclude collapsing data and conducting investigations across country lines in antidumping duty proceedings." *Slater Steels Corp. v. United States*, 297 F. Supp. 2d 1362, 1364-65 (Ct. Int'l Trade 2003). Therefore, Commerce properly concluded that Silcotub could not qualify as a producer of the subject merchandise because it cannot be a producer of CDMT in Italy, and consequently that CDMT produced in Romania "would not be subject to this proceeding." Appx1007.

The three cases that Plaintiff relies on do not support its claim that Commerce misapplied its regulation here, and the different facts make the outcomes inapplicable. As Commerce has stated, and this Court has recognized, collapsing determinations "are very much fact-specific in nature, requiring a case-by-case analysis{.}" *Final Rule*, 62 Fed. Reg. at 27,346; *see also Coalition of Am. Millwork Producers*, 581 F. Supp. 3d at 1303.

First, Plaintiffs cite *Utility Scale Wind Towers from Malaysia* in which Commerce collapsed Malaysian respondent C.S. Wind Malaysia with its Korean parent company C.S. Wind Corporation, claiming that

"{t}his case squarely supports the notion that collapsing can be applied even when one of the affiliates is not located in the subject country." Pls. Br. at 23-24 (citing *Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 56,894 (Dep't Commerce Oct. 13, 2021)*,* accompanying *Issues and Decision Memorandum* at Comment 1) (cited in Appx7655 at n.23) ("*Wind Towers IDM*")). Plaintiffs claim that Commerce "did not distinguish" the case and "arbitrarily required" Dalmine and Silcotub to be located in the subject country for the collapsing regulation to apply. Pls. Br. at 24. Neither claim is true.

In the *Remand Results*, Commerce addressed *Wind Towers* by citing it as an example of a case "{w}here non-producing entities (*e.g.*, exporters) are affiliated with a producing entity, Commerce evaluates whether there exists a significant potential for manipulation of prices and/or export decisions in considering whether to treat affiliated exporters and producers, such as Dalmine and Silcotub, as a single entity." Appx1008. Therefore, Commerce considered the case to require it to take into account the "totality of the circumstances" and focus on whether there is "a significant potential for manipulation" when

deciding whether to collapse a producer, such as Dalmine, with a non-producer, such as Silcotub. Appx1008.

In *Wind Towers*, Commerce relied on unique facts that do not exist here to justify collapsing a producer in one country with a non-producer in another country. The respondent produced subject wind towers in Malaysia under a tolling arrangement with the Korean parent, and the Korean parent provided the raw materials and exported the finished wind towers to U.S. unaffiliated customers. *Wind Towers IDM* at 3. Commerce collapsed the two companies finding that parent CS Wind Corporation "effectively controlled and managed every aspect of CS Wind Malaysia's sales and production of wind towers," and its "role in the production and sale of merchandise under consideration goes beyond simply acting as the exporter; because it also directed and controlled the production of the merchandise sold to the United States during the POI, it is also a producer of subject merchandise." *Wind Towers IDM* at 7 n.7. In contrast, Silcotub and Dalmine do not have a parent/subsidiary relationship and Silcotub does not have any operational control over Dalmine or its CDMT sales and production, let

alone control so extensive to render its role tantamount to that of a producer of subject merchandise.

In the *Remand Results*, Commerce addressed the second and third cases that Plaintiffs cite, *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan* ("*LWRT*") and *Crystalline Silicon Photovoltaic Cells from China* ("*Solar Cells*"), and confirmed that they were factually different from this case because "the entities at issue produced products which were within the scope of the orders/inquiry," whereas "it is impossible for Silcotub to produce subject merchandise at all {...}." Appx7766.

Plaintiffs attempt to rely for their cross-border collapsing argument on Commerce's decision in *LWRT* to collapse a Taiwan affiliate with a Vietnamese affiliate in the context of a circumvention inquiry. Pls. Br. at 25 (citing Appx7744-7745). They claim that the case stands for the proposition that it does not matter if affiliated companies are in different countries, but that the "relevant question is whether producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities {...}." Pls. Br. at 25-26. They improperly

dismiss Commerce's explanation that the case was distinguishable because it was a circumvention inquiry. Pls. Br. at 25. Commerce explained that, because it was a circumvention inquiry, "Commerce found that the products produced in Vietnam were in-scope merchandise only as a result of its finding that the LWRT competed {sic} in Vietnam was circumventing the AD order on LWRT from Taiwan." Appx7766. Due to the affirmative circumvention finding, Commerce treated the products made in Vietnam as products in the scope of the order on LWRT from Taiwan. The circumvention case and consequent finding that production in Vietnam is in-scope merchandise is not relevant for this case where CDMT produced in Romania would not be subject merchandise.

Finally, Plaintiffs rely on *Solar Cells* for the proposition that Commerce can collapse non-producing exporters of subject merchandise. Pls. Br. at 26. Commerce collapsed six Chinese producers with one Chinese exporter that did not produce based on past court and Commerce cases permitting such treatment where there exists the "significant potential for manipulation of process and/or export decisions." Appx7726. *Solar Cells* is not relevant for this case because,

28

unlike here, the producers and the exporter were all located in China,
the country to which the order applied, and Commerce found a
significant potential for manipulation. Moreover, the context of the case
as a non-market economy case ("NME") case is distinguishable because,
as Commerce stated in *Solar Cells*, "factors unique to the relationship of
business entities in the NME may lead Commerce to determine that
collapsing is either warranted or unwarranted." Appx7723-7724.

**2.    Commerce Correctly Determined That There
Was No Significant Potential for Manipulation of
Price or Production**

In the *Final Results* and *Remand Results*, Commerce considered the
"totality of the circumstances" and properly determined that there was
no significant potential for manipulation of price or production that
justified collapsing. Plaintiffs are wrong that Commerce ignored record
evidence and the cases they rely on to challenge Commerce's finding are
distinguishable. The Court should reject their efforts to impermissibly
have it reweigh the evidence. *Matsushita*, 750 F.2d at 933.

Based on the totality of the circumstances, Commerce determined
that the potential for manipulation of price or production does not exist.
Appx1008, Appx7767. Commerce stated that it "recognize{d} that

certain elements necessary for single entity treatment are present in this proceeding," noting the fact that Dalmine and Silcotub are affiliated and that Silcotub sells a major input to Dalmine and exports certain of the finished CDMT to the United States. Appx1008. However, it disagreed that collapsing was necessary "given the facts on this specific record." Appx1008.

Commerce relied on the following three facts on the record to support its finding that "the potential for manipulation of price does not currently exist:" (1) "Silcotub does not export, to the United States, Italian cold-drawn mechanical tubing produced by any other company than Dalmine;" (2) "Dalmine has fully reported Silcotub's downstream sales of Dalmine's cold-drawn mechanical tubing in its U.S. sales database{;}" and (3) "Silcotub does not have its own cash deposit rate (thereby creating the potential for the companies to export under the more advantageous of the two rates)." Appx1008, Appx7767.

Commerce also relied on the following two facts on the record to support its finding that "the potential for manipulation of production does not exist:" (1) "Silcotub is located in Romania and cannot produce subject merchandise or foreign like product;" and (2) "Dalmine fully

30

reported all production-related transactions with Silcotub, and these transactions are subject to the special rule for affiliated party costs." Appx1008, Appx7767.

Petitioners do not address Commerce's analysis of the facts on the record, but merely attempt to argue that their proposed analysis of two of the three factors in the regulation – managerial overlap and intertwined operations – support a different outcome. Petitioners are wrong. Even if the record could be open to more than one interpretation, as they claim, it does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. at 620.

Regarding ownership, Plaintiffs merely note Commerce's finding "that Dalmine and Silcotub are wholly owned by the same company" and "have significant transactions between them related to the production and sale of Italian cold-drawn mechanical tubing." Pls. Br. at 32 (citing Appx1007).

Regarding managerial overlap, Petitioners point to organization charts that Dalmine submitted and merely speculate that they "supported a finding of managerial overlap." Pls. Br. at 32-33. The charts Petitioners reference do not show that Dalmine and its managers

31

oversee Silcotub's operations or vice versa. Appx1068-1069. Commerce concluded that there is no evidence on the record of the review that "Dalmine and Silcotub have any overlap in management, nor is there any evidence that they have common members on their Boards of Directors or share facilities or employees." Appx1008, Appx7767.

Plaintiffs argue that, even if this factor was not met, Commerce "largely ignored" precedent in which Commerce collapsed entities even though "it determined that there was insufficient evidence of managerial overlap between the relevant entities." Pls. Br. at 33. The facts in the two cases they cite to that supported Commerce's decision to collapse in the absence of managerial overlap do not exist in this case. In the first case, *Copper Pipe and Tube from Vietnam*, Commerce collapsed Hailiang Vietnam ("HV") and Hailiang Hong Kong ("HK") finding a significant potential for manipulation based on intertwined operations, including among other facts that HK acted as the exporter for all U.S. sales with all sales of subject merchandise sold from HV to HK before they were ultimately sold to the unaffiliated U.S. customer, and that the two shared sales activities such as arranging production by HV based on customer purchase orders to HK. Appx7718-7720.

Commerce addressed *Copper Pipe and Tube from Vietnam* in its *Remand Results*, noting that it confirms that Commerce makes its determinations based on the "totality of the circumstances." Appx7767. In the second case, *Carbon and Alloy CTL from Korea,* Commerce collapsed the mandatory Korean respondent (POSCO) with 16 affiliated Korean companies that were distributors, relying on facts including the similarity of production facilities and the volume of transactions, and focusing on "preventing manipulation." *Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Final Determination of No Shipments of Antidumping Duty Administrative Review; 2016-2018*, 84 Fed. Reg. 70,951 (Dep't Commerce Dec. 26, 2019), accompanying Issues and Decision Memorandum at 13.

Finally, in their arguments regarding intertwined operations, Plaintiffs mischaracterize the record evidence. The record contradicts Plaintiffs' claim that "the production facilities of Dalmine and Silcotub are thoroughly intertwined to produce subject merchandise." Pls. Br. at 36. They inaccurately claim that "hollows and subject tubing transferred back and forth between Silcotub and Dalmine, demonstrating that, in essence, Dalmine and Silcotub share facilities."

33

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Pls. Br. at 37. This is simply not true. In fact, Dalmine sourced the

[ Quantification of portion      ] of the hollows that it used to produce CDMT

from its own facilities in Italy and it purchased the remaining hollows

from Silcotub, which produced these hollows at its facilities in Romania.

Appx3659. In separate transactions, Dalmine sold a portion of the

CDMT produced in Italy to Silcotub, which Silcotub cut in Romania,

and sold to the U.S. market. Appx1031.

Petitioners conveniently ignore the record evidence confirming the

separate production facilities and transactions. In response to

Commerce's supplemental Section A questionnaire, Dalmine confirmed

that "the subject CDMT sent to Silcotub for cutting was not produced

[ Description of transactions between Dalmine          ]." Appx3321. It also confirmed
and Silcotub

that "Dalmine and Silcotub structure the [

Description of transactions between Dalmine and Silcotub

]." Appx3321.

In addition, in yet another inaccurate statement, Plaintiffs claim

that "Silcotub's selling expenses {...} were reported by Dalmine in its

indirect selling expenses." Pls. Br. at 37. Commerce verified with

Silcotub officials the indirect selling expenses incurred by Silcotub

reported in field DINDIRS3U, which were only relevant for U.S. sales by Silcotub. Appx6795, Appx2545-2546. For Dalmine, Commerce verified with Dalmine officials its indirect selling expenses reported in field DINDIRS1U, which were only relevant for U.S. sales by Dalmine. Appx6795, Appx2545-2546. Commerce also verified with the Silcotub officials that the expenses and adjustments incurred by Silcotub were properly reported for U.S. sales made by Silcotub. Appx6793-6795. In its decision not to collapse, Commerce relied on the fact that the U.S. sales made by Silcotub were "fully reported": "Dalmine has fully reported Silcotub's downstream sales of Dalmine's cold-drawn mechanical tubing in its U.S. sales database, as required by section 772 of the Act." Appx1008, Appx7767.

Next, without citing any authority, Plaintiffs claim that Commerce should have found that the operations of Dalmine and Silcotub are intertwined merely because the Tenaris companies use "consolidated software, such as SAP, and procedures." Pls. Br. at 38 (citing Appx1035). As Commerce recognized, Dalmine and Silcotub are separate companies with separate production facilities located in two different countries, that are owned by Tenaris S.A. Appx1007. The use

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

of a common system, such as SAP, does not alter the separate legal status of these companies, but facilitates the integration of certain information, such as the consolidation of data into the consolidated financial statements of Tenaris S.A., as shown in the Tenaris S.A. annual report. Appx1590, Appx1604.

Building on their mischaracterizations of the record, Plaintiffs claim Commerce is ignoring record evidence regarding what they allege is the sharing of facilities or employees that supports intertwined operations. Pls. Br. at 39. They rely again on what they call Silcotub "produc{ing} hot-finished hollows that feed Dalmine's cold finishing operations, thereby accounting for a significant percentage of Dalmine's overall cost structure." Pls. Br. at 39. This is simply not true. To reiterate, Dalmine's own hollow production accounts for the [ Quantification of portion ] of the hollows used to produce CDMT by Dalmine. Appx3659.

Plaintiffs also rely again on *Solar Cells* to claim that the circumstances regarding intertwined operations are "similar" to those in this case. Pls. Br. at 40. In the *Remand Results*, Commerce confirmed that the facts in *Solar Cells* were different from this case because "the entities at issue produced products which were within the scope of the

orders/inquiry." Appx7766. As discussed, Commerce collapsed six

Chinese producers with one Chinese exporter that did not produce.

Appx7726. Moreover, the context of the case as an NME case is

distinguishable because, as Commerce stated in that case, it can decide

to collapse in NME cases based on "factors unique to the relationship of

business entities in the NME." Appx7723-7724.

### 3.    The Record Is Not Missing Data

Finally, contrary to Plaintiffs' claims, there is no basis for a remand

to collect further information. All information related to the subject

merchandise, CDMT from Italy, is fully reported on the record of the

underlying review.

Plaintiffs incorrectly claim that "the record is missing key data,"

asserting that Commerce "should have collected 'all of Silcotub's costs

and sales as a collapsed entity,' including 'the CONNUM-specific

manufacturing costs for Silcotub's hollows.'" Pls. Br. at 41. Dalmine

explained in its Section D response that it reported Silcotub's

CONNUM-specific costs for the hollows produced by Silcotub, and,

therefore, the relevant costs from Silcotub are not "missing" from the

record. Appx2994. Commerce did not use these costs because it applied

37

the major input rule for affiliated party purchases and made an adjustment to reflect the highest of COP, transfer price, or market price to value the hollows purchased from Silcotub at arm's length prices. Appx5173-5174, Appx5181.

Plaintiffs also claim that Commerce should request "'Silcotub's production process for subject and non-subject merchandise,' and 'Silcotub's costs and sales reconciliations.'" Pls. Br. at 41. Dalmine explained Silcotub's process for producing hollows, and it explained the cutting process at Silcotub. Appx2940, Appx3222-3226, Appx3659-3666. Dalmine also provided its cost reconciliation, which reflected the COP for hollows from Silcotub. Appx3092. In addition, Dalmine submitted the relevant sales reconciliation for Silcotub, the U.S. sales reconciliation for Silcotub's EP sales. Appx2489, Appx2596-2598.

Therefore, Petitioners point to no cost or sales information related to subject merchandise that is not already on the record. Commerce properly determined that the relevant sales and cost information was "fully reported," and that, with respect to the treatment of costs for hollows, it was appropriate to use the major input rule. Appx1008.

**CONCLUSION**

For the reasons set forth above, and in Defendant's Response Brief,

Defendant-Intervenor respectfully requests that this Court deny

Plaintiffs' motion for judgment on the agency record.

/s/ Kristina Zissis

Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600

Counsel to Dalmine S.p.A.

May 5, 2025

**Certificate of Compliance with**
**Court of International Trade**
**Standard Chambers Procedures**

Pursuant to this Court's Order dated February 14, 2025 (ECF No. 51), setting the word limitation to the Response Brief of Dalmine S.p.A. ("Defendant-Intervenor") to 7,000 words, counsel for Defendant-Intervenor certifies that this Response contains 6,943 words, including headings, footnotes, and quotations. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

/s/ Kristina Zissis

Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600

Counsel to Dalmine S.p.A.

May 5, 2025

## Certificate of Confidential Material

Pursuant to the Court's instructions for document formatting and ECF filing, I hereby certify that the foregoing brief contains 33 unique words marked confidential. This number is below the maximum permitted by Federal Circuit Rule 25.1(d)(1)(B).

/s/ Kristina Zissis

Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Dalmine S.p.A.

May 5, 2025